Clay King SMITH *v.* STATE of Arkansas

CR 99-353 39 S.W.3d 739

Supreme Court of Arkansas
Opinion delivered February 1, 2001

*James R. Wallace Associates,* by: *Tammy L. Harris,* for appellant.

*Mark Pryor,* Att'y Gen., by: *David R. Raupp,* Sr. Ass't Att'y Gen., for appellee.

ANNABELLE CLINTON IMBER, Justice. Clay King Smith was convicted of five counts of capital murder and sentenced to death by a Jefferson County jury on March 18, 1999. Mr. Smith waived his right to an appeal. This is an automatic review of the entire capital-murder and death-sentence record pursuant to the procedure this court set out in *State v. Robbins*, 339 Ark. 379, 5 S.W.3d 51 (1999). We find no error.

## Procedural History

In *State v. Smith*, 340 Ark. 257, 12 S.W.3d 629 (2000), we summarized the procedural history of this case up to that point, as follows:

> On March 18, 1999, judgment was entered reflecting that Clay King Smith had been found guilty by a jury of five counts of capital murder and sentenced to death. Counsel for Mr. Smith lodged a partial record on appeal from the judgment, and we granted a stay of execution on April 15, 1999. Mr. Smith subsequently filed a pro se motion to withdraw the appeal and have the matter remanded to the trial court for execution of the death sentence. In an unpublished per curiam order entered on July 8, 1999, we remanded the matter to the trial court for a hearing on whether Mr. Smith has the capacity to understand the choice between life and death and to knowingly and intelligently waive his right to appeal his sentence of death. Pursuant to our decision in *Franz v. State*, 296 Ark. 181, 754 S.W.2d 839 (1988), the State now submits to this court a transcript of the lower court's proceedings on remand, along with its petition for writ of certiorari, and requests that we review those proceedings and affirm the trial court's finding that Mr. Smith is competent to waive his appeals, including his postconviction remedies under Ark. R. Crim. P. 37.5.

*Id.*, 340 Ark. at 258, 12 S.W.3d at 629. Following a discussion of the requirement of automatic review of death-penalty cases established by this court's opinion in *State v. Robbins*, we held:

> Pursuant to our decision in *Robbins v. State, supra*, we conclude that an automatic review is necessary in this case where the death penalty has been imposed and where Mr. Smith has expressed his desire to waive his right to appeal the death sentence. Accordingly, we issue a writ of *certiorari* directing the Jefferson

County Circuit Clerk and the court reporter for the Jefferson County Circuit Court, Second Division, to prepare and file the complete record in this case within ninety days from the date of this order. We also appoint Tammy Harris, 212 Center St., Suite 100, Little Rock, AR 72201, to assist this court in its review of the record as outlined in *State v. Robbins, supra*. Specifically, appointed counsel shall abstract the record pursuant to Ark. S. Ct. R. 4-3(h) and argue any errors prejudicial to Mr. Smith.

*State v. Smith*, 340 Ark. at 259, 12 S.W.3d at 630. Ms. Harris has complied by filing an abstract and brief with the clerk of this court, and we now undertake our affirmative duty, pursuant to *State v. Robbins*, to review the record of this death-penalty case for egregious and prejudicial errors. In doing so, we review the record to: (1) evaluate whether Mr. Smith properly waived his right to appeal under *Franz*; (2) determine whether any errors raised to the trial court are prejudicial to Mr. Smith in accordance with Ark. Code Ann. § 16-91-113(a) (1987) and Ark. Sup. Ct. R. 4-3(h); (3) determine whether plain errors covered by the exceptions outlined in *Wicks v. State*, 270 Ark. 781, 606 S.W.2d 366 (1980) have occurred; and (4) determine whether other fundamental safeguards were followed. *State v. Smith, supra; State v. Robbins, supra*.

## Facts

The evidence in the record below reveals the following facts. At the beginning of 1998, Mr. Smith and Misty Erwin were living together at 3105 Pinto Road in Pine Bluff. On or about March 25, 1998, Misty Erwin, Shelly Sorg, Taylor Sorg, Sean Sorg, and Samantha Rhodes were murdered at that address. Misty Erwin died from either two or three separate gunshot wounds; Shelly Sorg died from four separate gunshot wounds; Taylor Sorg died from a single gunshot wound; Sean Sorg died from two gunshot wounds; and Samantha Rhodes died from three separate gunshot wounds.

Just two days before these victims were murdered, Corporal Calvin Terry of the Jefferson County Sheriff's Office had been dispatched to the parking lot of a store to meet Misty Erwin, who had reported being battered by her boyfriend, Mr. Smith. Ms. Erwin asked the officer to assist her in picking up her belongings at their residence on Pinto Road. Upon arriving at the Pinto Road residence, the officer found that Mr. Smith was present. Mr. Smith

and Ms. Erwin started talking to each other, and then Ms. Smith decided she would stay at the residence and not go to a women's shelter. She also decided not to press charges against Mr. Smith and signed a written statement to that effect. Corporal Terry testified that Mr. Smith and Ms. Erwin were "getting along together fine" when he left the residence.

Andy Hoots, a patrol officer with the Jefferson County Sheriff's Office, was dispatched at 8:00 p.m. on March 25, 1998, to a grocery store parking lot regarding a missing person's report. Once there, he met Misty Erwin's mother, Lula Erwin, who reported her daughter missing. Bobbie Erwin was also at the grocery store and reported her daughter, Shelly Sorg, and Shelly's two children, Sean and Taylor, missing. In order to make a complete report, Officer Hoots went to Pinto Road to find the street number of the residence that Lula Erwin and Bobbie Erwin described. He was also looking for Misty Erwin's vehicle, which had been reported missing. While patrolling on Pinto Road, Officer Hoots was flagged down by James Rhodes, the father of Samantha Rhodes, with whom he discussed the missing person issues he was in the process of investigating. Mr. Rhodes showed Officer Hoots the residence of Mr. Smith and Misty Erwin at 3105 Pinto Road. Officer Hoots approached the residence and knocked on the doors but received no response. He then looked around the residence but was unable to see inside. While doing so, Shelly Sorg's parents came to the residence and identified their daughter's vehicle parked at the residence.

Thereafter, Officer Hoots left the residence in order to meet with his superior and fill him in on the situation. As he was doing so, he received another call instructing him to return to 3105 Pinto Road due to suspicious circumstances. Upon arriving back at Pinto Road at approximately 10:30 p.m., Officer Hoots was met by the owner of the residence, Mark Lackey. Mr. Lackey used his key to open the door to the residence. When Mr. Lackey opened the door, Officer Hoots shined his flashlight inside the premises and saw blood stains on the carpet. He then leaned inside the doorway and saw blood splatters on the side of a washing machine or dryer. As he leaned inside the doorway and looked toward the back bedroom of the residence, Officer Hoots saw a deceased female stretched across a bed. He then backed out of the doorway, shut the door,

and called his superior to report what he had found. Soon thereafter, several police officers and investigators arrived.

One of the investigators who came to the scene was Stephen Moreau. He testified that he arrived at the crime scene on Pinto Road shortly after 11:00 p.m. He and Investigator Frank J. Moser, III, went inside the residence to check for victims needing medical attention and for possible suspects. Upon entering the back door, they found blood on the floor just inside the door. In the west bedroom, they found a female and a small child lying on the bed, both deceased. They were identified as Samantha Rhodes and Sean Sorg. In the living room, the investigator noticed a foot protruding from underneath a blanket covering a couch. Investigator Moreau looked under the blanket and found a deceased female. She was identified as Shelly Sorg. They also noticed the figure of a body sitting up in a recliner that was covered with a blanket. Investigator Moreau lifted a section of that blanket and found another deceased female. She was identified as Misty Erwin. After finishing their search of the house for other victims or suspects, the investigators left the residence and obtained a search warrant.

While Investigators Moreau and Moser were in the process of preparing a search warrant, the deputy coroner arrived at the residence. Investigator Moser, Investigator Eugene Butler, and the deputy coroner went back inside the residence so the deputy coroner could pronounce death and fix the time of death. She noted the temperature in the residence and checked the bodies of each of the victims in the bedroom and the living room. It was at this point that the body of another small child was discovered under the blanket covering the couch. The fifth victim was Taylor Sorg. The deputy coroner actually pronounced death at 11:41 p.m., but estimated that the victims had been dead for twenty-four to thirty-six hours.

After obtaining a search warrant, the investigators reentered the house to videotape the crime scene, take photographs, and collect evidence. They discovered great amounts of blood around the bodies and throughout the residence. They also found twelve spent .22 caliber shell casings and two bullet fragments in the areas where the victim's bodies were found.

Mr. Smith eventually became a suspect in the murders. In addition to the earlier report of a disturbance between Mr. Smith and Ms. Erwin on March 23, 1998, and the evidence discovered at the crime scene, the police officers interviewed bystanders and neighborhood residents. Sandra Haynes, who lived about 300 feet away from Mr. Smith and Ms. Erwin's residence on Pinto Road, testified that she looked out of her kitchen window at around 12:05 a.m. on March 25, 1998 and saw Mr. Smith leaving the residence. According to Mrs. Haynes, he stopped and looked at her for about ten seconds before getting into his car and driving away. Another witness, Becky Irons, told the police that she had heard Mr. Smith threaten to kill Misty Erwin and her family if Misty left him. Ms. Irons also reported that she had seen a rifle on the couch in Misty Erwin's residence when the threat occurred. On March 26, 1998, the prosecuting attorney filed a felony information and an arrest warrant issued.

Soon after leaving the Pinto Road residence, the investigating officers in Jefferson County received information that Mr. Smith was at a hunting club near Star City in neighboring Lincoln County. Accordingly, the Jefferson County officers went to Star City and met with officers from the Arkansas State Police and the Lincoln County Sheriff's Office to discuss their plans for arresting Mr. Smith. The various officers then proceeded to the hunting club. When they arrived, Mr. Smith fled on foot through a wooded area, and the officers pursued him. Mr. Smith, who was carrying a rifle, went 200 to 300 yards before he stopped running and began to walk. He then stopped walking and turned to confront the officers. At that point he was approximately fifteen yards away from an officer. For the next fifty-five minutes, Mr. Smith engaged in conversation with the officers but refused to drop his weapon. During the standoff, he made several incriminating statements. Finally, the confrontation ended when a state trooper shot Mr. Smith in the arm, and the officers took him into custody.

The trial began on March 17, 1999. On the previous Monday and Tuesday, a jury of twelve persons and one alternate was selected. During the guilt phase of the trial, the State introduced the testimony of eight witnesses. These witnesses included the police officer who responded to Misty Erwin's domestic dispute allegation against Mr. Smith two days before her murder; the neighbor who saw Mr. Smith leave the murder scene at about the same

time as the time of death estimated by the deputy coroner; the police officer who investigated the missing person reports and found the dead bodies at the Pinto Road address; the police officers who investigated the crime and arrested Mr. Smith; the medical examiner who conducted the post-mortem exam on the victims; and the firearms expert who concluded that bullet fragments recovered from the bodies of Samantha Rhodes, Shelly Sorg, and Misty Erwin, as well as twelve spent .22 caliber shell casings and two bullet fragments found at the crime scene were all fired from the .22 caliber rifle taken from Mr. Smith following his confrontation with the officers. Several of these witnesses were cross-examined by defense counsel. Following the trial court's denial of defense counsel's motion for a directed verdict at the close of the State's case, Mr. Smith offered no witnesses but did introduce several exhibits. At the close of all the evidence, defense counsel again renewed all motions previously made, and the trial court reaffirmed its previous rulings. The prosecuting attorney and defense counsel presented closing remarks, and, after receiving the court's instructions, the jury deliberated and found Mr. Smith guilty of five counts of capital murder.

The trial then proceeded to the penalty phase. At that point, Mr. Smith instructed his attorneys not to put on any evidence of mitigating factors; nor did he want them to cross-examine any of the State's witnesses or make closing remarks to the jury. Before allowing defense counsel to honor Mr. Smith's instructions, the trial court held a hearing and thoroughly questioned Mr. Smith regarding his decision. The trial court found that Mr. Smith voluntarily and intelligently waived his right to counsel and ordered defense counsel to respect his wishes.[1] The State offered the victim-impact testimony of Misty Erwin's sister, Samantha Rhodes's mother, and Linda Sue Clay, who was the mother-in-law of Shelly Sorg and the grandmother of Sean and Taylor Sorg. Mr. Smith then made a statement to the jury before the trial court read the penalty-phase instructions to the jury and the prosecuting attorney made the State's final closing argument. The jury again deliberated and recommended a sentence of death on all five counts of capital

---

[1] Defense counsel made a record in the form of a proffer of the evidence they were prepared to present on several of the mitigating circumstances enumerated in Ark. Code Ann. § 5-4-605 (Repl. 1997).

murder.[2]

## Franz *Analysis*

In *State v. Robbins*, 339 Ark. 379, 5 S.W.3d 51 (1999), this court indicated that a review of the entire record would be useful in evaluating whether the defendant properly waived his right to appeal under *Franz v. State*, 296 Ark. 181, 754 S.W.2d 839 (1988). Pursuant to our unpublished *per curiam* order entered on July 8, 1999, the trial court held a hearing on whether Mr. Smith has the capacity to understand the choice between life and death and to knowingly and intelligently waive his right to appeal his sentence of death. The trial court found that Mr. Smith is competent to waive his appeals, including his postconviction remedies under Ark. R. Crim. P. 37.5. We now review that finding.

In Arkansas, a defendant sentenced to death will be able to forego a state appeal only if he has been judicially determined to have the capacity to understand the choice between life and death and to knowingly and intelligently waive any and all rights to appeal his sentence. *Franz v. State, supra.* The standard of review is

---

[2] As to each count of capital murder, the jury unanimously determined that the following aggravating circumstances existed beyond a reasonable doubt at the time of the commission of capital murder:

> (1) Mr. Smith, in the commission of the capital murder, knowingly created a great risk of death to a person other than the victim or knowingly caused the death of more than one person in the same criminal episode;
>
> (2) that capital murder was committed for the purposes of avoiding or preventing arrest or effecting an escape from custody; and
>
> (3) that capital murder was committed against a person whom the defendant knew or reasonably should have known was especially vulnerable to the attack because of either a temporary or permanent or severe physical or mental disability which would interfere with the victim's ability to flee or defend himself.

The jury also unanimously found that the following mitigating circumstance existed:

> Clay King Smith has no significant history of a prior criminal activity at the time of this incident.

Finally, the jury concluded that:

> (A) one or more aggravating circumstances did exist beyond a reasonable doubt at the time of the commission of the capital murder; and
>
> (B) the aggravating circumstances outweigh beyond a reasonable doubt any mitigating circumstances found by any juror to exist; and
>
> (C) the aggravating circumstances justify beyond a reasonable doubt a sentence of death.

whether the trial judge's conclusion is clearly erroneous. *Franz v. State, supra.*

Not only did Mr. Smith file a *pro se* motion for withdrawal of the appeal timely filed on his behalf by counsel, but, in addition, Mr. Smith affirmed during the *Franz* hearing that he had a long-standing desire to waive his right to appeal and that he was doing so against the advice of his attorneys, who had told him that at least two reversible errors in the case could result in resentencing or retrial. He also affirmed that no one coerced him into waiving his right to appeal and that he made the choice freely and voluntarily. Furthermore, Mr. Smith's testimony showed that he understood his waiver would result in his execution, thereby permanently ending his life. Finally, Mr. Smith stated:

> I know my rights to appeal and all the mistakes that — some of the mistakes that were made in trial. I know that I could have a new trial and all those things, but I don't want that. I know that — to me that's wrong. And so — that's not right to try to fight those things and — just for fighting sake and for a few more years of life. That's not right to do that. And so I waive my appeals knowingly [sic] what would happen and I've made a decision. It was a decision that I thought about for a long period of time. Thought about, fast [sic] and prayed about, went over with my family. And it wasn't a light decision. It was something that was clearly thought about and that's my decision.

■ Dr. Charles H. Mallory of the Arkansas State Hospital evaluated Mr. Smith and testified that Mr. Smith understands the difference between life and death, the consequences of the death sentence, and the consequences of execution by lethal injection. He also stated that Mr. Smith understands his right to appeal and the posttrial relief available to him. He further expressed his opinion that Mr. Smith has the capacity to knowingly and intelligently waive any and all appeals and postconviction relief. Dr. Albert Kittrell of the State Hospital also testified that Mr. Smith has the ability to understand the difference between life and death. Based upon this evidence, we cannot say that the trial judge was clearly erroneous in finding that Mr. Smith is competent to waive his appeals, including his postconviction remedies under Ark. R. Crim. P. 37.5.

*Prejudicial-Error Review*

Counsel appointed to abstract the record and prepare a brief for this court's review brings three issues to this court's attention. Two of those alleged prejudicial errors occurred during the guilt phase of the trial, and the third occurred at the sentencing phase.

*Guilt Phase*

Appointed counsel first avers that the trial court denied the defendant's constitutional right to have a trial by a fair and impartial jury when it refused to remove a juror, George Rhoden, for misconduct. During the jury selection process on March 15-16, 1999, the trial court inquired about the jury's knowledge of the facts of the case and the witnesses and received no response from Juror Rhoden. After receiving responses from several other potential jurors, the trial court stated to the entire jury pool:

> Of those people who identified themselves having known something about this case by virtue of what you may have read in the paper, what you heard on the radio or TV or what you may have talked about at work and with other people. All those sources of information is what we refer to in the law as hearsay. It can be very, very reliable. It can be very, very unreliable. Those of you who have identified yourselves as having heard something about it or talked about it, or whatever, is there anyone of you who cannot, unless you hear that same information from the witness stand, under oath from a witness or through an exhibit that has been admitted into evidence, put aside what you may have heard on the streets, at work, over the TV, in the newspaper, heard on the radio, is there anyone who cannot set that aside and just consider solely what it is you hear from the witness stand?

Again, there was no response from Juror Rhoden. Thereafter, he was selected as juror number five by the State and the defense, and the trial court proceeded to tell all of the jurors not to discuss the case with anyone until the case was presented to the jury for deliberations.

On March 17, 1999, as the jury was seated to begin the guilt phase of the trial, the trial court made the following statement to the jurors:

> Good morning, ladies and gentlemen. Before we proceed this morning, was the — was the — there was an article this morning in the paper, and I'm sure all of you did what the Court ask [sic] you to do and that is not read anything about it, but did anybody bring it to your attention what may have been said in that article?

None of the jurors responded, and the jury was sworn in. Later that day, defense counsel indicated that there was a matter that needed to be addressed outside the presence of the jury. Accordingly, the trial court excused the jury, and defense counsel showed the court a copy of a newspaper bearing the headline "Smith tells attorney he wants to die; judge to delay ruling pending verdict" and an accompanying article. [3] Defense counsel also told the court that a copy of that newspaper had been seen lying in plain view in a car parked in one of the juror's parking spaces. The trial court reiterated that the jurors had been asked that morning whether any of them had read any accounts or heard anything about the proceeding and no one responded. Thus, the trial court decided to "take the jury's word for it" and not "call them a liar."

During another conference outside the hearing of the jury, defense counsel introduced an affidavit from a secretary with the public defender's office, which stated that a copy of the newspaper was in the front seat of a juror's car. A police officer also stated that the car belonged to Juror Rhoden. Defense Counsel then moved to have Juror Rhoden removed and an alternate juror seated and also asked the trial court to examine Juror Rhoden *in camera*. The trial court denied both requests, but ruled that Juror Rhoden could be summoned to the witness stand following the noon recess. Defense counsel, however, did not take advantage of that ruling. Near the end of the day, the trial court repeated its admonition to the jury about not discussing the case with anyone or reading anything about it. Defense counsel again asked the trial court to poll the jurors individually. The court agreed to think about that request. The prosecuting attorney then stated for the record that defense counsel had been offered the opportunity to go forward on the issue.

---

[3] On March 16, 1999, defense counsel had advised the trial court outside the presence of the jury that Mr. Smith "did not want any mitigation put on in case he was found guilty of capital felony murder. It is his choice he wanted to die." The trial court postponed an inquiry regarding Mr. Smith's ability to make that decision until such time as there was a finding of guilt on the capital murder charges.

On the following day, the jury entered the courtroom and the trial court again asked them *en masse* whether any information had come to their attention "either directly or indirectly, intentionally or unintentionally about this case other than what you have received in this courtroom?" No response was forthcoming from any of the jurors. Again, the prosecuting attorney asked that the record show that defense counsel was offered the opportunity to make further inquiry on the issue. Finally, after the jury began to deliberate during the guilt phase of the trial, defense counsel asked the trial court to restate for the record what had occurred during an in-chambers discussion about the newspaper issue. The trial court proceeded to summarize the earlier discussion, and the prosecuting attorney pointed out for the third time that the defense was given the opportunity to follow up with the jury. Appointed counsel now argues that the trial court's decision not to remove Juror Rhoden and replace him with an alternate juror constitutes prejudicial error. We disagree.

A juror is presumed to be unbiased and qualified to serve, and the burden is on the appellant to prove otherwise. *Esmeyer v. State*, 325 Ark. 491, 930 S.W.2d 302 (1996). It is for the trial court to decide whether a juror is qualified, and that finding will not be reversed absent a showing of abuse of discretion. *Id.* Likewise, we review the trial court's decision to remove a juror and seat an alternate for an abuse of discretion. *Lee v. State*, 340 Ark. 504, 11 S.W.3d 553 (2000). We have also held that the appellant must demonstrate prejudice in such cases. *Id.* The burden is on the appellant to prove that a reasonable possibility of prejudice resulted from juror misconduct, and prejudice is not presumed. *Dillard v. State*, 313 Ark. 439, 855 S.W.2d 909 (1993). Whether prejudice occurred is also a matter for the sound discretion of the trial court. *Id.*

In *Howell v. State*, 220 Ark. 278 , 247 S.W.2d 952 (1952), the appellant alleged error in the trial court's refusal to grant a mistrial because certain jurors read newspaper accounts of the trial's first day. We held that the trial court was correct in refusing to grant a mistrial because no prejudice was shown. Our holding was based primarily on the fact that the trial court, *after* learning of the juror misconduct, admonished the jury that a newspaper story is not evidence in a trial, and the jury is to base its verdict only on the evidence, proof, and testimony developed at trial. *Id.* Similarly, in

the present case, once the possibility of juror misconduct was brought to the trial court's attention, the court admonished the jury not to read or listen to any media coverage of the trial. The trial court also asked the jury whether they had received any information about the case "other than what you have received here in this courtroom?" Additionally, prior to the alleged juror misconduct being brought to the trial court's attention, the court asked the jurors if any of them had been told about the article in the newspaper. Even during the voir dire, the trial court warned prospective jurors about the unreliability of newspaper articles and asked them if they could consider only what they heard in court. Each of these inquiries by the trial court elicited no response from any of the jurors.

Moreover, in contrast with the facts in *Howell*, where six jurors admitted that they had read articles about the trial in the newspaper, there was no such admission by Juror Rhoden in this case, and Mr. Smith failed to prove that the juror actually read the newspaper article. Accordingly, no prejudice has been demonstrated in this case. Likewise, *Duncan v. State*, 260 Ark. 491, 541 S.W.2d 926 (1976), where the juror admitted that he had read the article despite the trial court's admonition, is inapposite.

As already noted above, while the jury deliberated during the guilt phase of the trial, defense counsel again raised the issue concerning Juror Rhoden. The trial court stated: "[l]et the record reflect that yesterday afternoon after we returned from lunch the subject of — that we had discussed about the paper in the juror's car was again taken up by counsel and the Court in chambers." The trial court and counsel then proceeded to relate, for the record, what occurred during that discussion. Appointed counsel now argues that such a discussion in the court's chambers was egregious error because "it is not evident from the record whether Smith was present while his counsel presented arguments to the Court." She further states that a criminal defendant has a right to be present in person in such situations.

Appointed counsel is correct that "[i]t is a basic principle of both our state's and our nation's criminal procedure that a defendant has the right to be present in person and by counsel when a substantial step is taken in his case." *Davlin v. State*, 313 Ark. 218, 853 S.W.2d 882 (1993). However, we cannot reach the

merits of this argument because, as appointed counsel concedes, the record fails to show that Mr. Smith was not present in chambers during the discussion. The party asserting error has the burden to produce a record sufficient to demonstrate prejudicial error, and this court does not consider evidence not included in the record on appeal. *Coulter v. State*, 343 Ark. 22, 25 S.W.3d 414 (2000).

For her second point of error, appointed counsel asserts that the trial court erred in not suppressing statements made by the defendant while he was being apprehended. During Mr. Smith's fifty-five-minute armed standoff with police at the hunting club in Lincoln County just prior to his arrest, Investigator Moser engaged in a heated exchange with the defendant, during which Mr. Smith made several incriminating statements, as seen from the following excerpt from Investigator Moser's testimony at the suppression hearing:

> Okay. Again, when we first stopped and he turned on me, he was yelling at us as much as we were yelling at him to drop the weapon. His comments were, "Just shoot me. Be a man." He'd tap on his chest. "Just shoot me. Be a man." And I said. "Clay don't do this." And he said. "Why?" I said, "You know, Clay, don't do this. Come with me." He said, "Why? You want to send me to prison." He — as the conversation continued, I kept saying, "Look, let's just talk about this. Let's you and I walk back to my car." I know at one time I even promised him I wouldn't handcuff [him] if he would just put down the gun and walk with me back to my car. He said, "All you want to do is send me to the penitentiary. I can't go to jail. I'd rather die for what I did." And then he'd holler, "Just shoot me. Come on, man. Just shoot me. Be a man."

Mr. Smith also asked to see his brother, Walt Chavis, who happened to be an officer with the El Dorado Police Department. The arresting officers had brought Officer Chavis with them so that he could talk to his brother if a confrontation occurred, as it did. Officer Chavis was placed in a bullet-proof vest and taken to the scene of the standoff. He began talking with his brother about religion, whereupon Mr. Smith stated: "I sent three of them to heaven. I don't know where the hell the other two went." When Officer Chavis asked him why he did it, Mr. Smith stated: "I was high on drugs. I was high." Finally, Investigator Moser testified that Mr. Smith stated: "I wish I could take a few days back. I shot

them. What can I do now?" Mr. Smith's motion to suppress those statements was denied after the trial court conducted a hearing outside the presence of the jury.

■ Appointed counsel makes two arguments for reversal. First, she contends that the statements should have been suppressed because the arrest warrant was invalid. Specifically, she says that the arrest warrant was invalid because it was based upon a statement given by Investigator Moser that "was not made under oath as required by the constitution and therefore the warrant was void on its face." The validity of the arrest warrant, however, is irrelevant in this case because the arresting officers did not rely on the warrant when Mr. Smith was taken into custody. Pursuant to Arkansas Rule of Criminal Procedure 3.1, a law enforcement officer may stop and detain any person who he reasonably suspects has committed a felony if such action is reasonably necessary either to obtain or verify the identification of the person or to determine the lawfulness of his conduct. *Hill v. State*, 275 Ark. 71, 628 S.W.2d 284 (1982). Whether there is reasonable suspicion depends on whether, under the totality of the circumstances, the police have specific, particularized, and articulable reasons indicating the person may be involved in criminal activity. *Id.*

■ Here, the officers who went to the hunting camp had information that Mr. Smith was seen at the site of a multiple-killing homicide at about the same time that the victims were allegedly killed, with one of the victims being his girlfriend who had recently accused him of battery. Therefore, they had reasonable suspicion to approach him for investigatory purposes and detain him. Before the police could even approach Mr. Smith and detain him, he fled from them while armed with a weapon. Flight from the police is a circumstance to be considered in a determination of probable cause to support a warrantless arrest. *Mock v. State*, 20 Ark. App. 72, 723 S.W.2d 844 (1987). A police officer may arrest a person without warrant if the officer has reasonable cause to believe that the person committed a felony. Ark. R. Crim. P. 4.1(a)(i). Probable cause exists where there is a reasonable ground of suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious person to believe that a crime has been committed by the person suspected. *Humphrey v. State*, 327 Ark. 753, 940 S.W.2d 860 (1997). Based on the totality of the circumstances in this case, including Mr. Smith's flight from police while armed with a weapon, we hold that

there was probable cause to arrest Mr. Smith without regard to the validity of the warrant.

 Appointed counsel also argues that the incriminating statements made by Mr. Smith to Officer Chavis should have been suppressed because the police failed to give Mr. Smith his *Miranda* warnings. However, *Miranda* warnings are not necessary in the absence of a custodial interrogation. *Riggs v. State*, 339 Ark. 111, 3 S.W.3d 305 (1999). *Miranda* warnings are not required simply because the questioned person is one whom the police suspect. *Id.* The safeguards prescribed by *Miranda* become applicable as soon as a suspect's freedom of action is curtailed to a degree associated with formal arrest. *Id.* Here, Mr. Smith fled from police while armed and was not overcome by the pursuing officers until he had already made the incriminating statements. Although Mr. Smith had stopped running and turned to face the police at the time he made the statements, he had not been apprehended and was still armed with a rifle. Nothing in the record indicates that Mr. Smith was surrounded by police to the extent that he could not turn and begin running away again if he so chose. Police pursuit of a suspect or their ordering the suspect to stop is generally not a seizure. *United States v. Thompkins*, 998 F.2d 629 (8th Cir. 1993). For a seizure to occur, there must be a physical application of force by the officer or submission to the officer's show of force. *Id.* A show of authority, without any application of physical force, to which the subject does not yield, is not a seizure. *California v. Hodari D.*, 499 U.S. 621 (1991). Based upon this record of an armed standoff between Mr. Smith and the police officers, we hold that Mr. Smith's freedom of action was not curtailed to a degree associated with formal arrest until he was shot in the arm by an officer and physically taken into police custody. By that time, the statements had already been made.

*Penalty Phase*

Finally, appointed counsel argues that the trial court committed error in the submission of aggravating circumstances to the jury. First, she alleges that the trial court erred by submitting a verdict form to the jury that combined two different sections into one aggravating circumstance. She states that the trial court erroneously combined the circumstance of "knowingly created a great risk of death to a person other than the victim" with "knowingly caused the death of more than one persons in the same criminal episode,"

both of which are found in Ark. Code Ann. § 5-4-604(4) (Repl. 1997). That argument, however, has not been preserved for appellate review.

■ Appointed counsel concedes that defense counsel failed to object below to the form in which the section 5-4-604(4) aggravating circumstance was submitted to the jury. Nonetheless, she contends that we should reach the merits of the issue because this challenge comes within the first exception to the requirement for an objection under *Wicks v. State*, 270 Ark. 781, 606 S.W.2d 366 (1980). The first *Wicks* exception states that in cases in which the death penalty is imposed we do not require an objection "to the trial court's failure to bring to the jury's attention a matter essential to its consideration of the death penalty itself." Here, it cannot be seriously alleged that the trial court *failed to bring to the jury's attention* a matter essential to the consideration of the death penalty. Instead, the quibble is with the form in which it *was* brought to their attention. Even if we were to hold that form to be erroneous, there is no dispute that all parts of the aggravating circumstance at issue were brought to the jury's attention for their consideration.

This case is clearly distinguishable from the two cases cited in *Wicks* as examples of the first exception to our objection rule. In *Wells v. State*, 193 Ark. 1092, 104 S.W.2d 451 (1937), the court failed to require the jury to find the degree of the crime, as required by statute, so the jury might have imposed the death penalty for a homicide below first-degree murder. In *Smith v. State*, 205 Ark. 1075, 172 S.W.2d 248 (1943), the trial court failed to tell the jury that it had the option of imposing a life sentence. Here, there was no such failure by the trial court. The trial court clearly brought every element of section 5-4-604(4) to the jury's attention.

■ Likewise, this case is unlike those cases subsequent to *Wicks* where we have applied the first *Wicks* exception; that is, *Camargo v. State*, 327 Ark. 631, 940 S.W.2d 464 (1997), where the jury failed to make the written findings necessary for the imposition of the death penalty as required by Ark. Code Ann. § 5-4-603 (Repl. 1997), and *Bowen v. State*, 322 Ark. 483, 911 S.W.2d 555 (1995), where the constitutional prohibition against *ex post facto* legislation was violated by the jury's consideration of an aggravating circumstance enacted after the commission of the crime. Here, the jury did not consider an invalid aggravator; nor did the jury fail to

correctly complete the verdict forms. For these reasons, we hold that the first *Wicks* exception is inapplicable.

 This case is factually similar to the situation presented in *Engram v. State*, 341 Ark. 196, 15 S.W.3d 678 (2000), where the appellant objected to the labeling of his three prior felonies as *three* aggravating circumstances rather than as three felonies supporting *one* aggravating circumstance. There, the appellant also conceded that he did not raise the issue below, but alleged that he could do so for the first time on appeal "because it concerns a matter essential to the jury's death penalty deliberations." Although we failed to make a ruling in *Engram v. State, supra,* on whether the situation in that case came within the first *Wicks* exception, we now hold that the situation currently before this court does not come within the first *Wicks* exception.

 Next, appointed counsel challenges the sufficiency of the evidence to support the jury's findings on each of the three aggravating circumstances.[4] However, Mr. Smith failed to preserve those arguments for appeal because he failed to timely move for a directed verdict to test the sufficiency of the evidence relating to the aggravating circumstances at the penalty phase of the trial. *Collins v. State,* 338 Ark. 1, 991 S.W.2d 541 (1999); *Willett v. State,* 322 Ark. 613, 911 S.W.2d 937 (1995). We also hold that this issue does not fall within the scope of the first *Wicks* exception. A challenge to the sufficiency of the evidence pertaining to an aggravating circumstance does not involve "the trial court's failure to bring to the jury's attention a matter essential to its consideration of the death penalty itself." *Wicks v. State,* 270 Ark. at 785, 606 S.W.2d at 369. Instead, just the opposite is true; that is, the trial court submitted each of the three aggravating circumstances to the jury for their consideration. There was simply no "failure" by the trial court, as is required by the plain language of the first *Wicks* exception. Moreover, as previously mentioned, this narrow exception to the objection requirement has only been applied in four cases, and we have limited its application to specific constitutional and statutory error arguments that are distinctly different from a sufficiency-of-the-evidence argument. *Camargo v. State, supra; Bowen v. State, supra; Smith v. State, supra; Wells v. State, supra.* In any event, an

---

[4] See f.n.2, p.9.

aggravating circumstance should be submitted to the jury when "even the slightest evidence" supports it. *Willett v. State, supra.* It is only on appeal that this court reviews a jury's determination that an aggravating circumstance existed under the substantial-evidence test; that is, whether a rational trier of fact could find the aggravating circumstance to have existed beyond a reasonable doubt. *Id.*

On those issues briefed by appointed counsel and properly preserved below, we find no prejudicial error. Additionally, an analysis of any remaining adverse rulings on objections, motions, and requests by Mr. Smith and his attorneys pursuant to Ark. Sup. Ct. R. 4-3(h) reveals no prejudicial error.

### Plain-Error Review Under Wicks Exceptions

Arkansas does not recognize plain error, i.e., an error not brought to the attention of the trial court by objection but nonetheless affecting substantial rights of the defendant. *State v. Robbins,* 342 Ark. 262, 27 S.W.3d 419 (2000). However, we have adopted limited exceptions. *Wicks v. State, supra.* In *State v. Robbins,* 339 Ark. 379, 5 S.W.3d 51 (1999), this court also mandated consideration of the *Wicks* exceptions in death-penalty cases like the instant case where the defendant has waived appeal. These exceptions are (1) a trial court's failure to bring to the jury's attention a matter essential to its consideration of the death penalty itself; (2) error by the trial judge of which the defense has no knowledge and therefore no opportunity to object; (3) a trial court's failure to intervene without objection and correct a serious error by admonition or declaring a mistrial; and (4) failure of the trial court to take notice of errors affecting substantial rights in a ruling admitting or excluding evidence, even though there is no objection. *Wicks v. State, supra.* Our review of the record reveals no errors under the *Wicks* exceptions to the rule in Arkansas that an argument for reversal will not be considered in the absence of an appropriate objection in the trial court.

### "Fundamental Safeguards" Review

The final review requirement under *State v. Robbins,* 339 Ark. 379, 5 S.W.3d 51 (1999), is to determine whether other fundamental safeguards were followed. The term "fundamental

safeguards" was not defined in that case nor do we attempt to do so here. Suffice it to say, nothing in the instant record reveals any irregularity in procedure that would call into question the essential fairness of the process afforded the defendant.

Affirmed.