Cite as 2019 Ark. 363

# SUPREME COURT OF ARKANSAS

**No.** CR–18–517

| | | |
|---|---|---|
| ERIC REID | | **Opinion Delivered:** December 5, 2019 |
| | APPELLANT | APPEAL FROM THE GARLAND COUNTY CIRCUIT COURT [NO. 26CR-15-670] |
| V. | | |
| STATE OF ARKANSAS | | HONORABLE JOHN HOMER WRIGHT, JUDGE |
| | APPELLEE | |
| | | <u>AFFIRMED</u>. |

**RHONDA K. WOOD, Associate Justice**

Eric Reid appeals from his two capital-murder convictions, a firearm enhancement, and his sentence of death. He alleges multiple errors during the trial's guilt and sentencing phases. We affirm.

## I. *Facts*

On October 19, 2015, Eric Reid killed his wife, Laura Reid, and his daughter, Mary Ann Reid. The night of the murders, Reid argued with Mary Ann regarding her parenting habits. Following the argument, Reid retrieved a pistol from his nightstand and shot his wife twice in the back and once as she lay on the ground. He then turned the gun toward his daughter, Mary Ann, and began shooting. Reid's first shot missed. But the second shot struck both Mary Ann and Heather, Reid's other daughter who was standing next to Mary Ann when the shooting began. Mary Ann retreated to the back of the house, and Reid

pursued. After shooting Mary Ann a total of four times, Reid walked to the end of the driveway and waited for the police.

At trial, there was no question that Reid killed his wife and daughter. The central issue was whether Reid's actions were premeditated and deliberate. The State's evidence included testimony from Heather. She depicted the week leading up to the shooting as volatile, describing ongoing disputes between Reid, Laura, and Mary Ann regarding financial struggles and parenting decisions. Heather also recounted the shooting. She explained how her father shot Laura and Mary Ann each at least one time after they were already down, and that after killing them both, Reid instructed her to call 911 and tell them that he had shot his wife and daughter.

The State also played Reid's police interview from the night of the murders. When asked to explain what happened, Reid stated that he knew he used "deadly force" after he allowed a woman to "draw [him] off sides" and "push [him] over the edge." Consistent with Heather's testimony, Reid explained that the tension with his wife and daughter had been "brewing for quite a while." Finally, the jury heard testimony from a prison guard who overheard Reid tell another inmate, "If you're going to shoot someone with a gun[,] make sure they die, like I did."

A jury convicted Reid of both capital-murder counts and a firearm enhancement. The jury sentenced him to death. Reid appeals his convictions and sentence.

## II. *Voir Dire*

Reid first argues that the circuit court abused its discretion in limiting his use of hypotheticals during voir dire. The extent and scope of voir dire falls within the broad

2

discretion of the circuit court. *E.g.*, *Isom v. State*, 356 Ark. 156, 171, 148 S.W.3d 257, 267 (2004). Accordingly, we will not reverse voir dire restrictions unless that discretion is clearly abused. *Gay v. State*, 2016 Ark. 433, at 5, 506 S.W.3d 851, 856. An abuse of discretion occurs when the circuit court acts arbitrarily or groundlessly. *Id.*

## A. Colorado Technique

Before trial, defense counsel requested permission to employ the "Colorado Method" of voir dire examination. This method presupposes a guilty verdict, and then utilizes increasingly specific hypotheticals to determine how likely a prospective juror will vote for death. The circuit court ruled that it would allow the use of general hypotheticals, but that it would not allow specific hypotheticals, as they would lead to "fact qualifying" potential jurors. During a break in voir dire, the State objected to Reid's use of a hypothetical involving a school shooting in Florida. The circuit court sustained the State's objection and cautioned Reid to only use general hypotheticals that were relevant to the case. On appeal, Reid contends that this restriction was improper.

Voir dire is conducted to identify and eliminate unqualified jurors; those who are not able to impartially follow the court's instructions and evaluate the evidence. *Morgan v. Illinois*, 504 U.S. 719, 729–30 (1992). As noted above, how this is accomplished falls within the court's discretion. *Isom*, 356 Ark. at 172, 148 S.W.3d at 268. The judge shall initiate voir dire by identifying the parties and their respective counsel, revealing any names of prospective witnesses, and briefly outlining the nature of the case. Ark. R. Crim. P. 32.2(a) (2019). But beyond these four requirements, counsel may only ask additional questions "as the judge deems reasonable and proper." *Id.*

3

In *Harmon v. State*, the circuit court limited the use of hypotheticals during voir dire that involved "specific factual issues not involved in th[at] case." 286 Ark. 184, 186, 690 S.W.2d 125, 126 (1985). On appeal, we opined that this limitation was not an abuse of discretion, reasoning that a defendant has never been "in a position to present a venireman a totally irrelevant hypothetical situation" during voir dire. *Id.* (quoting *Rector v. State*, 280 Ark. 385, 398, 659 S.W.2d 168, 175 (1983)).

Here, Reid was not entitled to unfettered examination through any means desired. *Isom*, *supra*. Limiting the use of emotionally charged hypotheticals—such as those involving school shootings—was well within the circuit court's broad discretion. The circuit court did not abuse its discretion in limiting Reid's use of hypotheticals during voir dire.

B. Strike for Cause

Reid also claims that, because he could not conduct unrestricted voir dire in the specific manner desired, he was compelled to exhaust his preemptory strikes prematurely. As a result, he contends that he was forced to accept Juror Phillips; a juror that he argued should have been struck for cause. The proper test for releasing prospective jurors for cause is whether their views would prevent or substantially impair the performance of their duties as jurors in accordance with their instructions and oath. *E.g.*, *Gay*, 2016 Ark. 433, at 9, 506 S.W.3d at 858.

Reid maintains that the court should have struck Juror Phillips for cause because his religion taught the principle of "an eye for an eye." Reid extensively questioned Phillips on this point. Without waver, Phillips maintained that, if "there are mitigating circumstances," he would consider them before deciding the issue of death. More directly, Reid asked

4

Phillips whether he would automatically impose the death penalty. Phillips responded that he would "have to see the evidence." Additionally, Phillips affirmatively stated that he could follow the law, that his decision on death would be based on "how the trial goes," rather than automatic, that he would consider both mitigators and aggravators prior to reaching a decision, and that he appreciated the option of mercy.

Although Reid argues on appeal that the voir dire procedure the circuit court adopted prevented him from unearthing Phillips's true bias, Reid made no such argument at trial. Therefore, based on Juror Phillips's answers, we hold that the circuit court did not abuse its discretion in concluding that Phillips could perform the duties of a juror in accordance with the court's instructions and his oath.

### III. *The State's Opening Statement*

Reid next asserts that the circuit court erred in denying his mistrial motion because the State's opening statement referenced evidence that was not adduced at trial. Specifically, the prosecution told the jury that, before Reid shot Mary Ann a final time, "he said something . . . to the effect he called her a bitch." Reid explained that he did not object to the statement when it was made because it was not yet apparent that the statement would not be supported by the evidence. But at the close of the State's case, Reid promptly moved for a mistrial.

Mistrial is an extreme and drastic remedy that is appropriate only when there has been error so prejudicial that justice cannot be served by continuing with the trial or when the fundamental fairness of the trial has been manifestly affected. *E.g.*, *McClendon v. State*, 2019 Ark. 88, at 6–7, 570 S.W.3d 450, 454. A circuit court has wide discretion to grant or

5

deny a motion for a mistrial, and absent an abuse of that discretion, the decision will not be disturbed on appeal. *Id.*

While the State should not appeal to prejudices, pervert the testimony, or make statements that cannot be proven during opening, "it is not uncommon for an attorney to outline in an opening statement what he or she anticipates the testimony is going to be, and then, in view of developments in the trial, decide not to produce that evidence." *Henry v. State*, 337 Ark. 310, 319, 989 S.W.2d 894, 898 (1999). Indeed, where evidence is admissible, a party may refer to it during opening statement. *Rank v. State*, 318 Ark. 109, 113, 883 S.W.2d 843, 845 (1994) (citing *Dixon v. State*, 310 Ark. 460, 839 S.W.2d 173 (1992)).

The statement here was made in good faith based on a witness's prior recorded statement. Additionally, the jury was specifically instructed that "[o]pening statements, remarks during the trial, and closing arguments of the attorneys are not evidence. . . . Any argument, statements or remarks of attorneys having no basis in the evidence should be disregarded by you." The circuit court did not abuse its discretion in denying Reid's mistrial motion.

IV. *The State's Closing Argument*

During closing arguments, the State said that Reid acted "like a coward" for shooting his wife in the back three times. When the State concluded its argument, Reid requested that the court admonish the jury regarding the "negative word." The court declined. On appeal, Reid asserts that it was prejudicial error not to admonish the jury.

The State contends that Reid's objection was not timely and therefore not preserved for appeal. We agree. In order to be timely, an objection must be contemporaneous with

the alleged error. *Smith v. State*, 330 Ark. 50, 53, 953 S.W.2d 870, 871 (1997). When an alleged error concerns a statement made by the State during argument, the defendant must make an immediate objection in order to preserve the allegation for appeal. *Id.* Absent a contemporaneous objection at trial, we will not review alleged errors in the State's closing arguments. *Lard v. State*, 2014 Ark. 1, at 26, 431 S.W.3d 249, 268.

Here, the State made the "negative" comparison during the first half of its closing. Yet Reid requested an admonition only after the State concluded its entire argument. Consequently, his objection was not sufficiently contemporaneous with the alleged error, and the argument was not preserved. The circuit court did not err in denying Reid's request for an admonition.

## V. *Admission of Evidence*

Reid raises two evidentiary issues on appeal. The decision to admit or exclude evidence is within the sound discretion of the circuit court, and we will not reverse that decision absent a manifest abuse of discretion. *E.g.*, *Perkins v. State*, 2019 Ark. 247, at 4, 582 S.W.3d 1, 3. This high threshold requires the circuit court to have acted improvidently, thoughtlessly, or without due consideration. *E.g.*, *Collins v. State*, 2019 Ark. 110, at 5, 571 S.W.3d 469, 472. Further, we will not reverse unless Reid demonstrates that the ruling prejudiced him. *Id.*

### A. The 911 Tape

Reid argues that the circuit court abused its discretion when it allowed the State to play a tape recording of the 911 call made immediately after the shooting. Although the contested portion of the tape described the shooting's aftermath, as well as resuscitation

efforts, Reid contends that this portion of the tape was irrelevant, cumulative, and prejudicial.

Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence more or less probable than it would be without the evidence. Ark. R. Evid. 401 (2019). The circuit court ruled that the 911 tape was relevant under the doctrine of res gestae. Under res gestae, the State can introduce evidence showing all the circumstances surrounding the charged act. *See Gaines v. State*, 340 Ark. 99, 110, 8 S.W.3d 547, 554 (2000). The doctrine provides context for the crime and places the jury in possession of the entire transaction. *Id*. Most notably, res gestae evidence is presumptively admissible. *Id*. Given our standard of review, we agree with the circuit court's conclusion that the 911 tape was relevant under the res gestae doctrine. It also described Laura's final moments before death, as well as Reid's unusually calm demeanor after the shooting.

But relevant evidence may nevertheless be excluded if its probative value is substantially outweighed by the danger of unfair prejudice or the needless presentation of cumulative evidence. Ark. R. Evid. 403 (2019). In *Davis v. State*, we held that a 911 recording was not unduly prejudicial, despite the caller's apparent hysteria. 368 Ark. 401, 411, 246 S.W.3d 862, 870 (2007). Further, we reasoned that "merely cumulative evidence" is not prejudicial, and that the State is entitled to prove its case as conclusively as possible. *Id*. at 411, 246 S.W.3d at 870–71; *see also Henry*, 337 Ark. at 316, 989 S.W.2d at 897. In *Passley v. State*, we similarly upheld the circuit court's decision to admit a 911 tape, despite the caller's frantic voice. 323 Ark. 301, 310, 915 S.W.2d 248, 253 (1996).

As in *Davis* and *Passley*, Reid contends that playing this 911 tape was so prejudicial that he was denied a fair trial, especially given the admission of other, less inflammatory forms of the same evidence. We are not persuaded. The 911 tape's probative value was not substantially outweighed by unfair prejudice or the needless presentation of cumulative evidence. The State was permitted to prove its case as conclusively as possible, and the circuit court did not abuse its discretion.

### B. Statement While Incarcerated

Additionally, Reid asserts that the circuit court abused its discretion when it permitted officer Kelley Hooker to testify about a remark that Reid made while incarcerated. Officer Hooker testified that she overheard Reid say to another inmate, "If you're going to shoot someone with a gun[,] make sure they die, like I did."

Although Reid objected to this statement in chambers, prior to the first day of the evidentiary trial, he failed to renew his objection during trial. Consequently, he waived the objection. *See, e.g.*, *Duck v. State*, 2018 Ark. 267, at 9, 555 S.W.3d 872, 877 (explaining that a defendant must object at the first opportunity and must then renew the objection each time the issue is raised; otherwise, the argument is waived).

### VI. *Aggravating Circumstances*

To impose death, a jury must find beyond a reasonable doubt that at least one aggravating circumstance exists. Ark. Code Ann. § 5-4-603 (Repl. 2013); *see also Decay v. State*, 2009 Ark. 566, at 13, 352 S.W.3d 319, 329. Aggravating circumstances are limited to the circumstances enumerated in Arkansas Code Annotated section 5-4-604.

Reid alleges two errors relating to the aggravating circumstances employed at sentencing. First, he asserts that the circuit court erred by presenting the aggravator in Arkansas Code Annotated section 5-4-604(4) as two separate circumstances. Second, he contends that the State failed to establish sufficient proof that he knowingly created a great risk of death to Heather Reid. We consider the sufficiency of the evidence first. *See Greene v. State*, 335 Ark. 1, 24, 977 S.W.2d 192, 203 (1998).

## A. Sufficient Evidence

We review the circuit court's decision to submit an aggravating circumstance for substantial evidence. *Dimas-Martinez v. State*, 2011 Ark. 515, at 22, 385 S.W.3d 238, 252. Evidence is viewed in the light most favorable to the State. *Sales v. State*, 374 Ark. 222, 231, 289 S.W.3d 423, 430 (2008). It is substantial if it is forceful enough to compel reasonable minds to reach a conclusion without having to resort to speculation or conjecture. *Id*. Here, Reid asserts that the State failed to sufficiently establish that he knowingly created a great risk of death to Heather Reid. Ark. Code Ann. § 5-4-604(4).

The appellant in *Swindler v. State*, 267 Ark. 418, 434, 592 S.W.2d 91, 99 (1979), made a similar argument. There, the State established that at least three bystanders were in the vicinity when the defendant fired multiple shots toward a service station storefront. *Id*. We reasoned that the defendant's actions demonstrated that he had no regard for the bystanders' lives, and that this lack of regard constituted "ample evidence" to support a finding that the defendant knowingly created a great risk of death to other people. *Id*.

Similarly, here, the jury did not have to resort to speculation or conjecture to conclude that Reid knowingly placed Heather in great risk of death. Indeed, Reid fired his

gun twice in Heather's immediate direction. His second shot hit Heather in the arm. He knew that Heather was standing next to Mary Ann. And he knew that he was employing deadly force, having just killed his wife. Accordingly, the circuit court did not err in submitting this aggravating circumstance to the jury.

## B. Arkansas Code Annotated Section 5-4-604(4)

Reid contends that the circuit court erred by presenting the aggravator in Arkansas Code Annotated section 5-4-604(4) as two separate circumstances. The State relied on the following aggravator:

> The person in the commission of the capital murder knowingly created a great risk of death to a person other than the victim *or* caused the death of more than one (1) person in the same criminal episode.

Ark. Code Ann. § 5-4-604(4) (emphasis added). The form submitted to the jury separated the two clauses into distinct options:

> In the commission of the capital murder, Eric Allen Reid, knowingly created a great risk of death to a person other than the victim, Heather Reid.
>
> [And/Or]
>
> In the commission of the capital murder, Eric Allen Reid, knowingly caused the death of more than one person, Mary Ann Reid and Laura Reid, in the same criminal episode.

On appeal, Reid argues that this separation prejudiced him because it gave the jury the impression that multiple aggravators supported the imposition of death.

In *Smith v. State*, the appellant alleged prejudice for the opposite reason. 343 Ark. 552, 571, 39 S.W.3d 739, 751 (2001). There, the appellant asserted that the circuit court erroneously combined the circumstance of "knowingly created a great risk of death to a

person other than the victim," and the circumstance of "knowingly caused the death of more than one person[] in the same criminal episode," into one aggravator on the verdict form. *Id.* We held that this argument was not preserved for appeal because the appellant failed to object to the form at her trial, and because it did not fall within a *Wicks* exception. *Id.*

At Reid's sentencing, the aggravator was presented to the jury as two distinct options, just as it is modeled by the Arkansas Supreme Court Committee on Criminal Jury Instructions. *See* 1 Arkansas Model Jury Instructions—Criminal Form 1. Like the defendant in *Smith*, however, Reid failed to object to this format at trial. As a result, Reid's argument is not preserved for appeal.

## VII. *Victim-Impact Evidence*

Finally, Reid contends that the court committed prejudicial error when it allowed the State to argue, during closing, that the jury should consider the victim–impact testimony as an aggravator. Circuit courts have broad discretion to govern counsel in closing arguments. *Lard*, 2014 Ark. 1, at 26, 431 S.W.3d at 268. We will not interfere with that discretion absent a manifest abuse of discretion. *Id.*

As stated above, aggravating circumstances are limited to the circumstances enumerated in Arkansas Code Annotated section 5-4-604. Victim-impact evidence is not an aggravating circumstance. *E.g.*, *Anderson v. State*, 367 Ark. 536, 543, 242 S.W.3d 229, 235 (2006). Rather, it is evidence presented during the sentencing phase of a capital–murder trial that is designed to inform the jury of the toll a murder has taken on a victim's family. *Thomas v. State*, 370 Ark. 70, 80, 257 S.W.3d 92, 100 (2007). It is both relevant and

12

admissible so long as it assists the jury in imposing a sentence. *Anderson*, 367 Ark. at 545, 242 S.W.3d at 236.

Most often, the State employs victim-impact evidence to counteract mitigating evidence. *E.g.*, *Greene v. State*, 343 Ark. 526, 535, 37 S.W.3d 579, 586 (2001). This is an accepted, relevant use for victim-impact evidence. *Id.* And not surprisingly, the jury is permitted to consider victim-impact evidence at the same time it considers mitigating evidence introduced by the defendant. *Id.*

Here, contrary to Reid's allegation, the State never suggested that victim-impact evidence should be viewed as an aggravating circumstance. Instead, during closing argument, the State urged the jury to weigh Reid's emotional distress against the emotional distress he inflicted on his family. The circuit court did not abuse its discretion in allowing the State's argument.

Alternatively, Reid contends that the court erred by preventing him from asking Heather Reid about the prospect of losing both parents. He proffered the expected testimony, reasoning that Heather would have stated "that she doesn't want to lose both of her parents." We have repeatedly held that penalty recommendations from family members of the victim are not relevant as victim-impact evidence. *E.g.*, *Miller v. State*, 2010 Ark. 1, at 34, 362 S.W.3d 264, 285. Victims and their families may not opine about the appropriate sentence. *Id.* The circuit court did not abuse its discretion.

In the interest of defending Arkansas's justice system, the victims, and the service of citizens who serve on juries, the court must respond to the dissent's criticisms.

13

First, the dissent focuses most of its effort defending Reid, describing him as "not the worst of the offenders." In attempting to make this point, the dissent veers perilously close to victim blaming. To suggest that the actions of Mary Ann Reid's "troubled" children or Laura Reid's spending habits somehow mitigated Reid's offense is distasteful.

Second, the dissent lists fourteen cases where, in its words, "not a single conviction resulted in the death penalty being assessed." Following the list, the dissent writes, "It is apparent that Mr. Reid was prejudiced by not being able to select a jury that could properly apply the law and select the correct sanction." The implication is that in those cases the juries correctly withheld imposing the death penalty, while in this case the jury did not. Yet in none of the listed cases were the juries given the option to impose the death penalty. In two of the cases, the court imposed the sentence rather than the jury.

Jury service is a critical part of our justice system. For the dissent to claim that Reid's "death sentence was all but inevitable" once the jury was selected does a grave injustice to the jurors' service in this case. Furthermore, while a robust debate of the law is necessary, unwarranted and unsubstantiated attacks on the victims and the jurors undermines our justice system.

VIII. *Rule 10 and Rule 4-3(i)*

When a sentence of death is imposed, we conduct an additional review of the record under Rule 10(b) of the Arkansas Rules of Appellate Procedure—Criminal, and Rule 4-3(i) of the Rules of the Arkansas Supreme Court. Pursuant to Rule 10 and Rule 4-3(i), the record has been examined and no reversible error exists.

HART, J., dissents.

14

**JOSEPHINE LINKER HART, Justice, dissenting.** In *Morgan v. Illinois*, 504 U.S. 719 (1992), the Supreme Court set out the general framework for constitutionally adequate voir dire in capital murder cases. The *Morgan* Court held that (1) due process required that a jury undertaking capital sentencing must be impartial and indifferent; (2) a capital defendant may challenge for cause any prospective juror who would automatically vote to impose death if defendant were convicted of the capital offense; (3) on voir dire, trial court was required, at defendant's request, to inquire into prospective jurors' views on capital punishment to identify unqualified jurors, as part of the guarantee of defendant's right to impartial jury; (4) trial court's general fairness and "follow the law" questions were not enough to detect those in venire who would automatically impose death; and (5) jurors who are unalterably in favor of or opposed to the death penalty in every case are unable to follow the law, and should be disqualified. The voir dire allowed by the circuit court did not comport with the basic principles of *Morgan*. Accordingly, the U.S. Constitution demands that Mr. Reid be given a new trial.

I am mindful that it is absolutely true that, as the majority succinctly states, "there is no question that Reid killed his wife and daughter." Certainly, a reasonable person could find that this is a horrible crime. However, death is the most severe sanction available to the State. Therefore, the death penalty must be reserved for the worst offenders. Thus, it is imperative that the jurors who must decide this question be able to discern when the ultimate sanction is warranted, as opposed to a severe, but less drastic sanction like life imprisonment.

Over Mr. Reid's objection, the State was allowed to "death qualify" the jury. However, Mr. Reid was not allowed to fully voir dire the jury in a way that would gauge a juror's ability to impartially apply the law with regard to consideration of aggravating and mitigating circumstances. Mr. Reid requested that the circuit court allow him to use the "Colorado Method" in jury selection. His stated intent was to identify jurors who are automatically going to impose the death penalty upon conviction. Mr. Reid was allowed to use the Colorado Method during a portion of the *voir dire*. After Mr. Reid successfully had several veniremen struck for cause, the circuit court adjourned the proceeding for a lunch break. Before voir dire resumed, the State objected to continuing with the watered-down version of the Colorado Method that the circuit court had previously authorized. It referred to the use of hypotheticals as "opening a can of worms," and the circuit court agreed. In its ruling, the circuit court eviscerated Mr. Reid's voir dire plan, ruling, "I don't mind you asking if someone who is clearly guilty of capital murder what do you think a sentence should be. Okay?"

In light of the clear dictates of *Morgan* the circuit court's restriction on Mr. Reid's voir dire questions virtually eliminated any meaningful process for determining whether the remaining jurors in the venire could properly weigh aggravating and mitigating factors. I am mindful that this court has stated that a circuit court's decisions regarding the extent and scope of voir dire is entrusted to the sound discretion of the circuit court and should not be reversed absent an abuse of that discretion. *Isom v. State*, 356 Ark. 156, 148 S.W.3d 257 (2004). However, judicial discretion

> means discretion bounded by rules and principles of law, and not arbitrary, capricious, or unrestrained. It is not the indulgence of judicial whim, but the

exercise of judicial judgment, based on facts and guided by law or the equitable decision or what is just and proper under the circumstances. It is legal discretion to be exercised in discerning the course prescribed by law and is not to give effect to the will of the judge, but to that of the law. . . . A liberty or privilege to decide what is fair and equitable under the peculiar circumstances of the particular case, guided by the spirit and principles of the law.

*Black's Law Dictionary* 323 (6th ed. 1990). From the context, it is apparent that the reason for the circuit court's reversal of its decision to abandon even the watered-down version of the Colorado Method that it had previously authorized was that it was identifying jurors who would not automatically impose the death penalty, which is exactly what the *Morgan* Court prescribed. This is a clear abuse of discretion.

It is a fundamental tenet of Eighth Amendment jurisprudence that the harshest sanctions should be reserved for the worst offenders—punishment that is disproportionate to the crime is cruel and unusual under the Eighth Amendment. *Roper v. Simmons*, 543 U.S. 551 (2005). In my view, it is likely that at least some fair-minded jurors would agree that Mr. Reid did not deserve the death penalty. Yet, in a county where capital cases are tried once a generation, without a more effective way to gauge juror attitudes such as the Colorado Method affords, Mr. Reid's death sentence was all but inevitable. This is not justice.

Mr. Reid is 57 years old. He is a twenty-year veteran of the United States Navy, which he joined at 18. His brushes with the law were minor and occurred more than 33 years ago—he has a DUI and an arrest for a domestic dispute with his first wife that landed him in jail overnight.

He lived in Hot Springs in a three-bedroom house along with his wife of 26 years, Laura Reid, and his youngest daughter, Heather Reid. Heather was eighteen and pregnant. Mr. Reid agreed to take in and help raise Seth Smith, 14, and Alexa Reid, 12, the troubled children of 32-year-old Mary Ann Reid, his daughter from a previous marriage. Mary Ann joined her children in the home. When Mary Ann moved in, she scuttled much of the progress that Mr. Reid had made in disciplining her children.

After his Navy career, Mr. Reid worked as a long-haul truckdriver until he was involved in an accident. He then took two jobs—doing manual labor full time for the City of Hot Springs street department and 20 to 30 hours a week assembling items for Wal-Mart. He also helped Laura with her dog-walking business and did lawn work on the side. Mary Ann contributed nothing to the household.

Financial issues often caused disagreements between Mr. Reid and his wife, as well as between him and his daughter, Mary Ann. Although Laura was supposed to pay the bills, Mr. Reid had recently discovered that she had allowed the bills to remain unpaid. Laura's spending habits were a further source of friction. Laura was threatening divorce.

Health concerns dogged Mr. Reid. At the time of the shooting, he was suffering from the lasting effects of prostate cancer treatment, which required him to wear diapers and pads. He no longer had a sexual relationship with his wife. Reid was also suffering from an anxiety disorder and was taking medication for depression.

On the evening of October 19, 2015, Laura and Mary Ann were out in the garage retrieving items from their shopping trip earlier that day. Mr. Reid followed Mary Ann into the garage. Mr. Reid and Mary Ann began arguing about her son, Seth. Mr. Reid told Mary

Ann to leave the house, but she insisted he should be the one to leave. At some point, Mr. Reid retreated from the argument and retired to his bedroom. While in his bedroom, Mr. Reid heard Mary Ann say "F--- him." He claimed he saw a flash of light, and that he does not remember shooting Laura and Mary Ann. However, Heather testified that after Mr. Reid shot Mary Ann, he told her to call 911 and tell them that he had shot his wife and his daughter. He walked to the end of his driveway and waited there for the police.

The trial began with no dispute that Mr. Reid shot two family members. However, it is obvious that Mr. Reid is not the worst of the worst offenders. Since the beginning of October, this court and the court of appeals reviewed fourteen murder cases—all heinous crimes—and not a single conviction resulted in the death penalty being assessed. *Finley v. State*, 2019 Ark. 336 (life sentence for two murders conducted in the furtherance of a liquor store robbery; sentenced to life); *Price v. State*, 2019 Ark. 323 (life sentence for murder and two counts of aggravated robbery for returning to shoot up a dice game where Price lost his money); *Holmes v. State*, 2019 Ark. App. 508 (40-year sentence plus 5-year firearm enhancement for murdering a child in a road-rage incident); *Sirkaneo v. State*, 2019 Ark. 308, 586 S.W.3d 606 (life sentence for murder and attempted murder); *Thompson v. State*, 2019 Ark. 290, 586 S.W.3d 163 (life sentence for two murders and an attempted murder in a home-invasion robbery); *Rankin v. State*, 2019 Ark. App. 481, 588 S.W.3d 379 (25 years for revenge murder); *Bowman v. State*, 2019 Ark. App. 469, 588 S.W.3d 129 (30 years for starving her infant child to death); *Ellis v. State*, 2019 Ark. 286, 585 S.W.3d 661 (life for murder committed by shooting 29 times into an occupied vehicle); *Coakley v. State*, 2019 Ark. 259, 584 S.W.3d 236 (life sentence for revenge murder); *Pree v. State*, 2019 Ark. 258,

583 S.W.3d 380 (life sentence for murdering an acquaintance to steal his vehicle); *Braud v. State*, 2019 Ark. 256, 583 S.W.3d 392 (life sentence for capital murder and two first-degree battery counts against friends); *Terrell v. State*, 2019 Ark. App. 433, 587 S.W.3d 594 (23 years for shooting the victim in the head with a shotgun and burning the body); *Gillard v. State*, 2019 Ark. App. 438, 586 S.W.3d 703 (10 years plus 5-year enhancement for stabbing an infant's father to death because he had not arrived to take the child as promised); *Clark v. State*, 2019 Ark. App. 455, 588 S.W.3d 64 (conviction reversed). It is apparent that Mr. Reid was prejudiced by not being able to select a jury that could properly apply the law and select the correct sanction.

I dissent.

*Willard Proctor, Jr., P.A.*, by: *Willard Proctor, Jr.* and *Dominique T. King*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Chris R. Warthen*, Ass't Att'y Gen.; and *Joseph Karl Luebke*, Ass't Att'y Gen., for appellee.