Kenneth R. ISOM *v.* STATE of Arkansas

CR 02-213 148 S.W.3d 257

Supreme Court of Arkansas
Opinion delivered February 19, 2004

[Rehearing denied April 1, 2004.*]

---

* CORBIN, J., not participating.

*Dorcy K. Corbin*, Arkansas Public Defender Commission, for appellant.

*Mike Beebe*, Att'y Gen., by: *Kent G. Holt*, Ass't Att'y Gen., for appellee.

R OBERT L. BROWN, Justice. Appellant Kenneth R. Isom appeals from a judgment of conviction for capital murder, residential burglary, attempted capital murder, rape, and aggravated robbery.[1] He was sentenced to death for capital murder and received additional sentences of life in prison for aggravated robbery and for rape, sixty years for attempted capital murder, and forty years for residential burglary, with the sentences to run consecutively. He raises multiple points on appeal. We hold that there is no merit to the points raised, and we affirm.

The facts are taken from testimony at trial. On April 2, 2001, Ken Oulette drove by Bill Burton's residence in Monticello around 7:00 p.m. and saw Dorothy Lawson, age 72, standing in the yard in front of Mr. Burton's trailer home, talking with a gentleman who was sitting on the front stairs of the house next door to Mr. Burton's residence. Mr. Oulette later identified Mr. Isom from a photographic lineup and then in court without objection. Linda Kay Johnson, who lived across the street from Mr. Burton, also saw Mr. Isom and Mrs. Lawson talking outside Mr. Burton's residence before 7:00 p.m. She had known Mr. Isom for a long time and had seen him at Alfred Collins' house, which was next door to Mr. Burton's trailer home, on previous occasions. She said that Mr. Isom was wearing a white tee-shirt and dark pants. Ms. Johnson later identified Mr. Isom in the courtroom at his trial without objection.

Dorothy Lawson testified that she had been assisting Bill Burton, age 79, her deceased husband's brother-in-law, in his rehabilitation following hip surgery. Mrs. Lawson was at Mr. Burton's trailer home the night of April 2, 2001, and was watching television with Mr. Burton when she heard someone knock on the door. It was about 7:45 p.m. but still light outside. She opened the front door, and a man pushed passed her. She recognized the man

---

[1] Mr. Isom was charged and convicted of murder perpetrated while in the commission of a felony (Ark. Code Ann. § 5-10-101(a)(1) (Repl. 1997)), as opposed to deliberate and premeditated murder (Ark. Code Ann. § 5-10-101(a)(3)-(5) (Repl. 1997)).

as the person she had seen next door. She later identified that person as Mr. Isom. He walked over to Mr. Burton and, standing near him, said, "I want some money." Mr. Burton replied that he currently had no money but that his social security check was coming tomorrow.

Mr. Isom pulled a pair of broken scissors from his pants' back pocket and threatened Mr. Burton. Mr. Burton gave him two $100 bills and another forty dollars. Mr. Isom became angry and said he wanted more. He made Mr. Burton stand up and walk towards the bedroom. He then made Mr. Burton lie down on the floor in the hallway. Mr. Isom next grabbed Mrs. Lawson and told her to remove her pants and underwear and lie down in the hallway near Mr. Burton. Mr. Isom raped her vaginally, forced her to have oral sex with him, and raped her anally. During the rapes, Mrs. Lawson testified that she could clearly see his face. When she complained about the pain, Mr. Isom said: "It's going to be worse than this before the night's over." There was a knock at the back door, and Mr. Isom said: "Don't say a word. If you do, I'll kill you. I'll kill you now." Whoever was at the back door apparently left.

Mr. Isom forced Mrs. Lawson into a closet. When she later looked out and told Mr. Isom to stop standing on Mr. Burton's head because he was old, Mr. Isom forced her back into the closet and said: "I know he's old. That's why I want to hurt him." She next saw Mr. Isom lying on top of Mr. Burton. She attacked Mr. Isom and in the process cut her hand on his scissors. She bled on Mr. Isom, which enraged him, and he said: "You're going to get it now." He demanded the diamond rings worn by Mr. Burton. Mrs. Lawson gave Mr. Isom her ring instead. Mr. Isom took her into the bedroom and knocked her unconscious. When she awoke, Mr. Isom was choking her. Mrs. Lawson testified that she could plainly see his face. She passed out again, and when she awoke some time later, she was alone. There was warm blood on the back of her head and rattling in her chest due to internal bleeding. She discovered that she was paralyzed on one side.

On April 3, 2001, Erma Shook, a neighbor and relative of Bill Burton's, entered the side door of his trailer home after 8:00 a.m. and heard Mrs. Lawson crying for help. Ms. Shook dialed 9-1-1 from Mr. Burton's trailer home. Donald King, a patrol sergeant with the Monticello Police Department, was the first to arrive at the scene. He testified that he found Mr. Burton dead, lying on the floor in the hallway, and Mrs. Lawson lying on the floor in the master bedroom. The cause of death of Mr. Burton was

later determined by associate medical examiner, Dr. Charles Kokes, to be multiple sharp and blunt force injuries. Mrs. Lawson told Sergeant King that a black male who lived next door was the assailant.

Shortly thereafter, Scott Woodward, who was a criminal investigator for the Arkansas State Police, Lieutenant John Dement, Chief of Police Sam Norris, and Monticello Police Officer Eddie Deaton arrived on the scene. Officer Woodward and Lieutenant Dement conducted an investigation of the scene. No fingerprints were found at the scene.

Officer Woodward failed to find any blood from Mr. Burton on the trailer walls and only saw what looked like blood that ran from Mr. Burton's body and pooled on the carpet. Mr. Burton's left pants pocket was slightly open, and his wallet without any cash inside was laying next to him. Officer Woodward did find a disfigured lamp near where Mrs. Lawson was lying. The lamp was wrapped with a cloth, and the top of the lamp was detached. The lamp and the cloth both had blood spatters or staining on them as did the wall and other areas near Mrs. Lawson. There also was a jewelry box that appeared to have been tampered with, because some of the drawers were askew. Mrs. Lawson told Officer Woodward that the man who lived next door knew her assailant.

Mrs. Lawson was transported to Drew Memorial Hospital later that morning where Dr. William W. Williams performed a rape-kit examination on her and where police officers asked her questions. Dr. Williams found a thick, black hair in Mrs. Lawson's vaginal opening.

Lieutenant Michael Hall of the Arkansas State Police and Special Agent Dennis Duran, a criminal investigator supervisor with the Arkansas State Police, arrived at the hospital around 1:00 p.m. that same day to take a statement from Mrs. Lawson. Mrs. Lawson "did not appear to have any problem being precise about what she said. She was very coherent." He added that she had "all her faculties about her." Mrs. Lawson described her assailant as a black male, five feet and seven inches tall to six feet tall and of stocky, muscular build, who appeared dark-complected. She had seen him several times at a neighbor's house before the attack and murder. She did not mention scars or tattoos on the face of her assailant.

Lisa Channell, the chief criminalist with the Arkansas State Crime Lab, testified at trial that on April 4, 2001, she compared the black hair found by Dr. Williams on Mrs. Lawson with a known

sample of Mr. Isom's hair. She stated that she found the black hair to be Negroid and not from Mr. Burton or Mrs. Lawson but microscopically similar to the known pubic hair sample from Mr. Isom. Melissa Myhand of the Arkansas State Crime Lab also analyzed the hair from the rape-kit for DNA. Her testing revealed that Mrs. Lawson and Mr. Burton were excluded as potential contributors to the hair sample. She stated that Mr. Isom had DNA bands not inconsistent with the known sample and that the likelihood of finding another person with the same consistent DNA bands was one in fifty-seven million in the African-American population.

On April 5, 2001, Lieutenant Dement visited with Mrs. Lawson in the hospital to see if she could identify her assailant from a photographic lineup. In creating the photographic lineup, Lieutenant Dement testified that he considered race, dress, and facial hair of the participants. He testified that before the identification, Mrs. Lawson was "coherent." He stated that she was in her hospital bed, she wiped her eyes with a washcloth, and she wore her eyeglasses. She examined each picture, holding them closely to her face, without saying anything. After first focusing on photographs one and three, she selected photo three, which was Mr. Isom. Lieutenant Dement added that she expressed no uncertainty and was very adamant about her identification.

A criminal information was filed, accusing Mr. Isom of capital murder, aggravated robbery, theft, burglary, attempted capital murder, and rape. A motion to suppress the photographic lineup was filed by Mr. Isom and later denied by the circuit judge. On December 17, 2001, the prosecutor filed an amended criminal information against Mr. Isom, accusing him of capital murder, aggravated robbery, residential burglary, attempted capital murder, and rape.

The jury trial began on December 17, 2001, and lasted four days. Mr. Isom did not testify. Following the trial, the jury returned a verdict, convicting Mr. Isom of the crimes previously mentioned and sentencing him accordingly.

### I. Insufficient Evidence

Mr. Isom contends that the State presented insufficient evidence to convict him of capital murder. Due to double jeopardy considerations, we review this issue prior to other issues raised on appeal. *See, e.g., Jones v. State*, 349 Ark. 331, 78 S.W.3d 104 (2002).

The basis for Mr. Isom's contention is that the State presented no evidence to show that Mr. Isom committed murder "in the course of and in the furtherance of the felony," as required in the capital murder and first-degree murder statutes. *See* Ark. Code Ann. §§ 5-10-101(a)(1) and -102(a)(1) (Repl. 1997). In addition, he points out that law enforcement investigators searched for over five hours and failed to find any evidence at the crime scene linking him to the crimes committed. Specifically, Mr. Isom asserts that no fingerprints, no hairs, no skin, and nothing under Mrs. Lawson's fingernails were found connecting him to the crime. He further underscores the fact that there was no testimony shown that he had any injuries on his body, as the police officers suspected the person who committed the crimes would have had. Also Mr. Isom emphasizes that the State's medical expert, Melissa Myhand, could not decipher whether one hair that was partially degraded, which was the only evidence found on Mrs. Lawson after Dr. Williams's examination, belonged to a male or female. Yet Ms. Myhand testified that the likelihood that the hair belonged to someone other than Mr. Isom in the African-American population was one in fifty-seven million.

Mr. Isom also argues that Mrs. Lawson's identification of him as the attacker was flawed in that she gave conflicting stories to police officers and failed to state that her attacker had a scar on his face or that he had gold teeth, which were two of Mr. Isom's distinctive features. He adds that the neighbor's description of him wearing a white tee-shirt conflicted with Mrs. Lawson's description of her attacker, who she said was wearing a tee-shirt with an orange lightening bolt.

As an initial matter, we agree with the State that Mr. Isom only raised one issue under this point on appeal: whether the murder of Mr. Burton occurred "in the course of and in furtherance of " a predicate felony. *See* Ark. Code Ann. § 5-10-101(a)(1) (Repl. 1997). All other points relative to his convictions for aggravated robbery, residential burglary, rape, or attempted capital felony murder that were argued before the circuit judge appear to have been abandoned on appeal. Thus, we need not address them. *See, e.g., Echols v. State,* 354 Ark. 530, 127 S.W.3d 486 (2003); *Dansby v. State,* 350 Ark. 60, 84 S.W.3d 857 (2002).

Our standard of review when considering whether substantial evidence exists is summarized as follows:

> When reviewing the sufficiency of the evidence on appeal, this court does not reweigh the evidence but determines instead

whether the evidence supporting the verdict is substantial. Substantial evidence is defined as direct or circumstantial evidence that is forceful enough to compel reasonable minds to reach a conclusion one way or another and that goes beyond mere speculation or conjecture. In determining whether there is substantial evidence, this court reviews the evidence in the light most favorable to the State. Only evidence supporting the verdict is considered. We will affirm if there is any substantial evidence to support the verdict.

*Hale v. State*, 343 Ark. 62, 74, 31 S.W.3d 850, 857, *cert. denied*, 532 U.S. 1039 (2001) (internal citations omitted).

 Circumstantial evidence alone may be sufficient to support a conviction for capital felony murder since the law makes no distinction between circumstantial evidence and direct evidence. *See Davis v. State*, 314 Ark. 257, 863 S.W.2d 259 (1993), *cert. denied*, 511 U.S. 1026 (1994); *Friar v. State*, 313 Ark. 253, 854 S.W.2d 318 (1993); *Williams v. State*, 258 Ark. 207, 523 S.W.2d 377 (1975). Recently, this court said in connection with circumstantial evidence in a death case:

> Circumstantial evidence provides the basis to support a conviction if it is consistent with the defendant's guilt and inconsistent with any other reasonable conclusion. Such a determination is a question of fact for the fact-finder to determine. The credibility of witnesses is an issue for the jury and not the court. The trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. We will disturb the jury's determination only if the evidence did not meet the required standards, thereby leaving the jury to speculation and conjecture in reaching its verdict. When we review a challenge to the sufficiency of the evidence, we will affirm the conviction if there is substantial evidence to support it. Additionally, the longstanding rule in the use of circumstantial evidence is that the evidence must exclude every other reasonable hypothesis than that of the guilt of the accused to be substantial, and whether it does is a question for the jury.

*Howard v. State*, 348 Ark. 471, 484, 79 S.W.3d 273, 281, *cert. denied*, 537 U.S. 1051 (2002) (internal citations omitted).

We turn then to our Criminal Code. The Homicide section reads in part that a person commits capital murder if:

> Acting alone . . . , he commits or attempts to commit rape, . . . robbery, [or] burglary, . . . and in the course of and in furtherance

of the felony, . . . he . . . causes the death of any person under circumstances manifesting extreme indifference to the value of human life[.]

Ark. Code Ann. § 5-10-101(a)(1) (Repl. 1997).

A person commits rape under our Criminal Code if "he engages in sexual intercourse or deviate sexual activity with another person [b]y forcible compulsion." Ark. Code Ann. § 5-14-103(a)(1) (Repl. 1997). A person commits aggravated robbery if "he commits robbery as defined in § 5-12-102, and he: (1) Is armed with a deadly weapon or represents by word or conduct that he is so armed; or (2) Inflicts or attempts to inflict death or serious physical injury upon another person." Ark. Code Ann. § 5-12-103(a) (Repl. 1997). Section 5-12-102 states that a person commits robbery if "with the purpose of committing a felony or misdemeanor theft or resisting apprehension immediately thereafter, he employs or threatens to immediately employ physical force upon another." Ark. Code Ann. § 5-12-102(a) (Repl. 1997). Finally, a person commits residential burglary if he "enters or remains unlawfully in a residential occupiable structure of another person with the purpose of committing therein any offense punishable by imprisonment." Ark. Code Ann. § 5-39-201(a)(1) (Repl. 1997).

There was an abundance of evidence to support the conviction of Mr. Isom for capital murder. Mrs. Lawson identified him as her attacker in the attempted murder and rapes and as the person who was physically abusing Mr. Burton. She further testified that Mr. Isom demanded and received money and her ring, using the threat of the broken scissors. Her testimony also is sufficient to support a burglary conviction in that she stated that he pushed his way into Mr. Burton's trailer home and proceeded to commit rape and aggravated robbery. And, finally, her in-court identification of Mr. Isom, as well as the body hair found in her vagina connecting him to the rape, placed him at the scene where Mr. Burton was murdered. While Mrs. Lawson did not specifically see Mr. Isom stab Mr. Burton with scissors or beat Mr. Burton with a lamp, she saw Mr. Isom with the scissors standing on Mr. Burton's head and then physically lying on top of him. She also heard his threats. She was then beaten, knocked unconscious, and choked by Mr. Isom. Mr. Burton's body was discovered the next morning, and his death was caused by multiple sharp and blunt force injuries. We conclude that there was more than sufficient

evidence, direct and circumstantial, that Mr. Isom caused the death of Mr. Burton in the course of committing several felonies under circumstances manifesting extreme indifference to the value of human life.

## II. Voir Dire

Mr. Isom mounts several arguments contesting the manner in which the *voir dire* of the *venire* was conducted.

### a. Rehabilitation of the Venire

During the course of *voir dire*, the circuit judge dismissed several potential jurors for cause, because they stated that they could never vote for the death penalty regardless of what the facts of the particular case might prove to be. This was in response to the circuit judge's question of whether they could ever consider the death penalty. Mr. Isom first argues that the circuit judge's denial of his request to rehabilitate the jurors was inconsistent with the due process clause of the Fourteenth Amendment. He contends that by denying him an opportunity to conduct in-depth questioning of prospective jurors, the defense was prohibited from producing different answers from prospective jurors than those originally stated. He particularly took issue with the circuit judge's observation at one point that additional *voir dire* by the defense would be a "waste of time."

The State responds that whether the circuit judge abused his discretion is the standard of review upon appeal and that there was no abuse of discretion by the circuit judge in conducting the *voir dire*. The State also objects to Mr. Isom's aggregating his claims regarding *voir dire* without making a cumulative-error objection. The State further maintains that Mr. Isom failed to demonstrate how he was prejudiced by the circuit judge's *voir dire*, because the judge followed the narrow excusal-for-cause standard set out by the United States Supreme Court in *Witherspoon v. Illinois*, 391 U.S. 510 (1968), rather than the broad standard established in *Wainwright v. Witt*, 469 U.S. 412 (1985).

The extent and scope of *voir dire* examination is within the sound discretion of the circuit judge, and the latitude of that discretion is wide. *See Henry v. State*, 309 Ark. 1, 828 S.W.2d 346 (1992). The judge's restriction of that examination will not be reversed on appeal unless that discretion is clearly abused. *Id.*

Abuse of discretion occurs when the circuit judge acts arbitrarily or groundlessly. *See Walker v. State*, 304 Ark. 393, 803 S.W.2d 502 (1991).

Arkansas Rules of Criminal Procedure provide the procedure for the conduct of proper *voir dire* in a criminal trial:

> (a) Voir dire examination shall be conducted for the purpose of discovering bases for challenge for cause and for the purpose of gaining knowledge to enable the parties to intelligently exercise peremptory challenges. The judge shall initiate the voir dire examination by:
>
> (i) identifying the parties; and
>
> (ii) identifying the respective counsel; and
>
> (iii) revealing the names of those witnesses whose names have been made known to the court by the parties; and
>
> (iv) briefly outlining the nature of the case.
>
> (b) The judge shall then put to the prospective jurors any question which he thinks necessary touching their qualifications to serve as jurors in the cause on trial. *The judge shall also permit such additional questions by the defendant or his attorney and the prosecuting attorney as the judge deems reasonable and proper.*

Ark. R. Crim. P. 32.2(a) and (b) (emphasis added). The fact that the Rules allow the circuit judge to permit such additional questioning as he or she deems proper underscores the discretion vested in the circuit judge.

This court has said that the proper test to be used in releasing a prospective juror for cause is whether the person's views would prevent or substantially impair the performance of his or her duties as a juror in accordance with his or her instructions and oath. *See, e.g., Williams v. State*, 288 Ark. 444, 705 S.W.2d 888 (1986). Because Arkansas recognizes the death penalty, jurors in a capital murder case must be able to consider imposing a death sentence if they are to perform their function as jurors. *Id.* The circuit judge in *Williams v. State, supra*, correctly decided that jurors who could not consider imposing a death sentence were properly

excused for cause, because they could not perform their duties. We have further said that the purpose of *voir dire* examination is to discover if there is any basis for challenges for cause and to gain knowledge for the intelligent exercise of peremptory challenges, not to attempt to commit the jurors to a decision in advance. *See Nutt v. State*, 312 Ark. 247, 848 S.W.2d 427 (1993).

 In 1968, the United States Supreme Court reversed a petitioner's death sentence in *Witherspoon v. Illinois*, 391 U.S. 510 (1968). The Court said:

> [A] State may not entrust the determination of whether a man should live or die to a tribunal organized to return a verdict of death. Specifically, we hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. No defendant can constitutionally be put to death at the hands of a tribunal so selected.

*Witherspoon v. Illinois*, 391 U.S. at 521-22. However, the Court added that if the State "had excluded only those prospective jurors who stated in advance of trial that they would not even consider returning a verdict of death, it could argue that the resulting jury was simply 'neutral' with respect to penalty." *Id.* Failure of a prospective juror even to consider a verdict of death is what this court believes to be the permissible standard for excusal for cause under *Witherspoon*.

 In 1985, the United States Supreme Court decided a second jury-selection case involving capital punishment. *See Wainwright v. Witt*, 469 U.S. 412 (1985). In *Wainwright*, the Court clarified its decision in *Witherspoon v. Illinois, supra*, regarding the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment. The Court said that the standard is "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright*, 469 U.S. at 424 (internal quotations omitted).

██ We conclude that the circuit judge did not abuse his discretion in refusing to allow Mr. Isom's counsel to attempt to rehabilitate prospective jurors by additional *voir dire* questions.[2] Under Rule 32.2(b), the judge can allow questions from counsel as the judge deems reasonable and proper. Accordingly, it lies within the sound discretion of the circuit judge to disallow additional questioning as unreasonable or improper under the circumstances. The circuit judge had already posited the general question of whether the prospective jurors could consider the death penalty under any circumstances. A negative answer resulted in excusal for cause at times. At times, the judge clearly did not believe that additional questions would be productive or beneficial. In light of this, it was not an abuse of the circuit judge's discretion to disallow further questions by defense counsel.

### b. Death Penalty Verdict Form

Mr. Isom assigns additional error to the fact that the circuit judge allowed the prosecutor to ask prospective jurors whether they could commit to signing a death penalty verdict form rather than simply asking whether they could never under any set of facts consider the death penalty, which was the standard established in *Witherspoon v. Illinois, supra.* He argues further that it was error for the circuit judge to dismiss these individuals for cause when they answered that they could not sign such a verdict form. Finally, Mr. Isom argues that the judge erred in allowing the prosecutor repeatedly to ask potential jurors how they would vote if certain facts were proven at trial, which he maintains was prohibited questioning under *Hobbs v. State,* 277 Ark. 271, 641 S.W.2d 9 (1982).

The State responds that not only did defense counsel not object to the prosecutor's asking potential jurors whether they could sign a death-verdict form, but defense counsel asked the same question to members of the *venire.* The State urges that this court will not consider an issue where the activity in contention was not objected to at trial. Moreover, the State contends that the prosecutor was justified in asking the question, because Arkansas law requires that all twelve jurors must sign the verdict form to

---

[2] We note on this point that the circuit judge did allow additional questioning of some potential jurors by defense counsel.

impose a death sentence. *See* Ark. Code Ann. § 5-4-603(a) (Repl. 1997); *Greene v. State*, 343 Ark. 526, 37 S.W.3d 579, *cert. denied*, 534 U.S. 858 (2001).

█ We agree with the State that defense counsel failed to object to the prosecutor's questioning about signing the death-verdict form. Thus, the issue is not preserved for our review unless it falls within the *Wicks* exception regarding a "trial court's failure to bring to the jury's attention a matter essential to its consideration of the death penalty itself." *Wicks v. State*, 270 Ark. 781, 785, 606 S.W.2d 366, 369 (1980). We conclude that this issue does not fall within that exception. Trial counsel, the judge, and the prospective jurors were all well aware that the issue was whether those persons could sign the death-verdict form. Hence, the matter is not preserved for our review. *See, e.g., Howard v. State, supra.*

*c. Juror Schenk*

Mr. Isom next posits that venireman James Schenk was excused for cause, "yet he never stated that he could not sign the verdict form." The relevant colloquy follows:

> MR. SCHENK: I could vote for it, but it comes up to the hang up, though, of signing your name. That's —
>
> DEFENSE COUNSEL: Okay. What's the problem with that?
>
> MR. SCHENK: To me it, I guess, it's my upbringing and everything. Now, I'm not against the death penalty and he may need it. I don't know. I hadn't heard the case yet. But to me it's kind of just putting my seal that I approve of death. I don't have control over death. God has that. And I don't want to interfere with Him.
>
> DEFENSE COUNSEL: Okay.
>
> MR. SCHENK: But, now, if it gets right down to it, I, you know, it could possibly go either way. But I'm not going to stand here and tell you I can sign, sign it and then get in the courtroom and can't or get into a place where I can't. So it's a question.
>
> DEFENSE COUNSEL: Sure. It's not something that we think about very often that, what we would do if we're in that

situation. But after you determined that he was guilty beyond a reasonable doubt of capital murder, and you determined that there is ample justification for imposing the death penalty, and the eleven other jurors plus you all agree, could you not then sign it?

MR. SCHENK: Possibly I could. I won't guarantee that.

DEFENSE COUNSEL: You know, it's an extremely difficult job that you're asked to do, and I don't minimize it at all. But it seems to me if you can vote to impose it, signing your name if you believe that it's appropriate, I don't see where there's that big a problem. But I want you to explain it to me other than when you think it seals their fate?

MR. SCHENK: It's just kind of a seal to me when you, when you sign your signature, you're just kind of a seal. And I, you know, it's what the state law says. But when I have to sign my name to what the state law says, it is — Well, it's confusing me and I probably can't answer it.

DEFENSE COUNSEL: You can't say one way or the other then?

MR. SCHENK: No, I can't.

DEFENSE COUNSEL: So while you might lean toward not being able to sign, under certain circumstances you might be able to sign?

MR. SCHENK: You can leave it at that.

Defense counsel argued that Mr. Schenk wavered on his ability to sign the verdict form and should not be excused for cause. The circuit judge then said: "If someone says they do not know whether they could, it infers the possibility that they can't, so I'm going to grant that on cause on Mr. Schenk."

Again, this court's focus must be on whether the circuit judge abused his discretion in excusing Mr. Schenk for cause. We conclude that the judge did not. This is not a case where Mr. Schenk was merely expressing "conscientious or religious scruples against capital punishment." *See Witherspoon v. Illinois, supra.* Nor did Mr. Schenk typify a jury "organized to return a verdict of death." *See Morgan v. Illinois,* 504 U.S. 719 (1992). Here,

Mr. Schenk expressed reservations three times that signing a death-verdict form was akin to placing his seal on death. In response to defense counsel's questions, he said "possibly" he could, but he would not guarantee it. There was a substantial question here as to whether Mr. Schenk's views would impair his performance as a juror. *Wainwright v. Witt, supra; Pickens v. State,* 301 Ark. 244, 783 S.W.2d 341, *cert. denied,* 497 U.S. 1011 (1990). There was not abuse of discretion by the circuit judge.

### d. Batson Challenge

Mr. Isom next contends that the State improperly excluded *venire* persons on the basis of race and that the circuit judge erred by not conducting a reasonable and sensitive inquiry into the race-neutral reasons advanced by the prosecutor. Specifically, he points to the fact that he is African-American and the two victims were white. He then emphasizes that eleven African-Americans were excused for cause as being unable to consider death as a penalty. Two additional African-Americans were struck by the State as peremptory challenges. Mr. Isom urges once more that the State improperly crossed the line of neutrality by eliminating from the jury all who opposed the death penalty in principle, which violates *Witherspoon v. Illinois, supra.* He further argues that the circuit judge errantly failed to question the prosecutor's initial encouragement to defense counsel to challenge a *venire* person, Dock Nelson, for cause, when later the prosecutor used a peremptory strike to remove that same juror. He adds that the composition of the jury violated the fair cross-section-of-the-community requirement of the Sixth Amendment to the United States Constitution, as well as the Eighth Amendment to the United States Constitution. In short, he contends that his jury was fundamentally defective.[3]

In *Batson v. Kentucky,* 476 U.S. 79 (1986), the United States Supreme Court reversed and remanded an all-white jury's conviction of an African-American defendant for second-degree burglary and receipt of stolen goods. The Court held: "If the trial court decides that the facts establish, prima facie, purposeful discrimination and the prosecutor does not come forward with a neutral explanation for his action, our precedents require that petitioner's conviction be reversed." *Batson,* 476 U.S. at 100.

---

[3] This court cannot discern from the record or arguments of counsel whether an African-American *venire* person actually sat on Mr. Isom's jury.

In *MacKintrush v. State*, 334 Ark. 390, 978 S.W.2d 293 (1998), this court established three steps to be used outside the hearing of the *venire* when the opponent of a peremptory challenge makes a *prima facie* case of discrimination, with the burden of persuasion always resting on the opponent of the challenge. First, the opponent of the challenge must present facts to raise an inference of purposeful discrimination by showing (1) that the challenge's opponent is a member of an identifiable racial group, (2) that the challenge is part of a jury-selection process or pattern designed to discriminate, and (3) that the challenge was used to exclude jurors because of their race. If the circuit judge determines that the opponent failed to present a *prima facie* case, the inquiry ends here. However, if the judge determines that a *prima facie* case exists, the inquiry continues to the second step.

The second step places the burden of producing a racially neutral explanation for the challenge on the proponent of the challenge. The proponent must offer "more than a mere denial of discrimination or an assertion that a shared race would render the challenged juror partial to the one opposing the challenge." *MacKintrush*, 334 Ark. at 398, 978 S.W.2d at 296. However, the reason given need not be persuasive or even plausible. *See Purkett v. Elem*, 514 U.S. 765 (1995) *(per curiam)*. The reason will be deemed race neutral unless a discriminatory intent is inherent in the proponent's explanation.

The third step involves the circuit judge's decision on purposeful discrimination. The opponent to the challenge must persuade the circuit judge that the expressed motive of the striking party is not genuine but is the product of discriminatory intent. The circuit judge then must weigh and assess what has been presented in light of all the circumstances, including an assessment of credibility and whether the proponent's explanation was pre-textual.

Though we have some question as to whether Mr. Isom made a *prima facie* case of racial discrimination, we are convinced that the prosecutor offered race-neutral explanations for his two peremptory challenges. With respect to Dock Nelson, Mr. Nelson volunteered during *voir dire* that he had been taught "not to take another life." That answer, in this court's judgment, is a sufficient race-neutral reason for the challenge. Prospective juror Milton Jackson was struck by the State, and defense counsel

objected. The prosecutor replied that Mr. Jackson had been sleeping during *voir dire*, had not shown up on time to the courthouse, and was known to be "strange." Again, the prosecutor's response qualifies as a race-neutral reason. There was no abuse of discretion by the circuit judge in denying the *Batson* challenge.

### e. Arbitrary and Capricious Strikes

Mr. Isom next claims that the circuit judge conducted *voir dire* arbitrarily and capriciously in violation of Arkansas Rule of Criminal Procedure 32.2 (1) by striking *venire* persons for cause who knew Mr. Isom and who expressed hesitancy or concerns about the death penalty, and (2) by not striking those prospective jurors who knew the Lawson family and who were prone to vote for the death penalty. At specific issue is the circuit judge's handling of prospective juror Billie Handley and prospective juror Sanders Bealer. In the case of Ms. Handley, the judge inquired how she would lean and she answered: "Honestly, I think I'd lean towards Ms. Lawson." The judge then asked whether she could set aside what she read in the newspapers, and she answered that she believed she could and that she would be fair. No request was made by defense counsel to remove her for cause.

Mr. Bealer, on the other hand, leaned toward Mr. Isom because he'd been associated with Mr. Isom for years. When asked by the judge whether he could be fair, he said: "I think I would probably lean his way." The judge then excused him for cause. Defense counsel attempted to rehabilitate Mr. Bealer about whether he could fairly evaluate the evidence, but he said that his mind was "basically already set" and that even in the face of evidence he would still be thinking "another way." The judge repeated his excusal for cause, and again, the defense counsel failed to object.

This issue is disposed of due to the defense counsel's failure to object. Moreover, we fail to see how this scenario with Ms. Handley and Mr. Bealer qualifies under any *Wicks* exception to our contemporaneous-objection rule. *See Wicks v. State*, 270 Ark. 781, 606 S.W.2d 366 (1980). Certainly, it is not "a matter essential to [the jury's] consideration of the death penalty." *Wicks*, 270 Ark. at 785, 606 S.W.2d at 369. The issue is not preserved for our review. *See Howard v. State, supra.*

### f. Family Wishes

Mr. Isom next maintains that the jury was tainted when the prosecutor was allowed to imply during *voir dire* what sentence the

victims' families wanted. The precise statement by the prosecutor was: "I need to know now if there's anybody who'd have any reservations about [signing a death penalty verdict and individually stating aloud if that is your verdict], because I, the State and the people involved with the State in this case, feel very strongly that that is the appropriate sentence in this case." Mr. Isom's counsel promptly objected and stated that what the victim wanted was inadmissible. The circuit judge ruled that what the prosecutor said was "argument and we don't need to get into that, stating a personal belief." The judge then permitted questions to the jury about whether they could personally vote for the death penalty.

 Mr. Isom presents no authority in support of this issue and merely concludes that the jury was tainted. When a party does not cite authority or provide convincing argument, this court will not consider the merits of the arguments. *See, e.g., McClina v. State*, 354 Ark. 384, 123 S.W.3d 883 (2003); *Ware v. State*, 348 Ark. 181, 75 S.W.3d 165 (2002). Neither was done in this case, and this court will not do the research for Mr. Isom. There was no abuse of discretion by the circuit judge regarding this issue.

### III. Photographic Lineup

Mr. Isom argues that the circuit judge erred in denying his motion to suppress the photographic lineup, because the other men in the photographs did not properly resemble him. Thus, the lineup was not reliable. According to Mr. Isom, the other men in the photographic display had facial hair and either had long hair or very short hair. Mr. Isom contends that he did not have facial hair and had medium-length hair. He also urges that the photographic lineup should have been suppressed, because Mrs. Lawson had just experienced a very traumatic act and had given a very general description of her assailant (black male, from five feet and seven inches tall to six feet tall) and had failed to include Mr. Isom's gold teeth and facial scar. Plus, Mrs. Lawson did not recognize her eye doctor, whom she regularly visited, when she was in the hospital. He adds that Mrs. Lawson was initially uncertain of her choice, because she first focused on pictures one and three.

 Although we question Mr. Isom's premise that the lineup was unduly suggestive, we decide this issue on a procedural point. As the State points out, Mr. Isom failed to object to Mrs. Lawson's in-court identification of Mr. Isom and, thus, failed to preserve this point for appeal. *See, e.g., Kimble v. State*, 331 Ark.

155, 959 S.W.2d 43 (1998); *Milholland v. State*, 319 Ark. 604, 893 S.W.2d 327 (1995); *Van Pelt v. State*, 306 Ark. 624, 816 S.W.2d 607 (1991). We said in *Kimble* that this failure to object to an in-court identification has the effect of waiving any issue relating to an allegedly defective photographic lineup. Mr. Isom's argument has no merit.

## IV. Closing Argument

Mr. Isom raises several claims of prejudicial error in connection with the prosecutor's closing argument. We discuss those claims *seriatim*.

Mr. Isom first contends that in the prosecutor's rebuttal closing argument during the sentencing phase, he impermissibly lessened the jury's sense of responsibility for assessing the death penalty with two comments. First, the prosecutor argued:

> The Defendant, by his actions, sealed his fate. Not by what you do. You're just determining what he did. That's your job. That's what we talked to you about from the very beginning.

Later on, he argued: "Bill Burton, he had only one judge, one jury, and one executioner. There is no appeal for Mr. Burton." Defense counsel objected to neither comment. Now, on appeal, Mr. Isom contends that prejudice resulted by lessening the jury's responsibility, just as it did in *Caldwell v. Mississippi*, 472 U.S. 320 (1985).

We first consider whether the circuit judge had a duty to intervene and admonish the jury or declare a mistrial in light of these comments, even though defense counsel failed to object. *See Wicks v. State, supra.* In other words, does the contention that the prosecutor sought to lessen the jury's responsibility in sentencing Mr. Isom to death rise to the level of a *Wicks* exception even without an objection by defense counsel. There are two *Wicks* exceptions that are pertinent. First, there is the *Wicks* exception already alluded to in this opinion, where the circuit judge fails to bring to the jury's attention a matter essential to its consideration of the death penalty. Secondly, there is the *Wicks* exception for when a circuit judge fails in his duty to intervene and correct a serious error in the prosecutor's closing argument either by admonition to the jury or by declaration of a mistrial. We conclude that when a prosecutor seeks to lessen the jury's responsibility for

rendering a verdict of death, this qualifies as a situation for when the circuit judge should intervene. Accordingly, we will address the issue of whether the prosecutor's argument violated the Eighth Amendment and *Caldwell v. Mississippi, supra.*

In *Caldwell v. Mississippi, supra,* the United States Supreme Court vacated the petitioner's death sentence for his murder conviction, because the jury in that case was led to believe that its responsibility for determining the petitioner's fate lay elsewhere. During closing argument, the prosecutor had told the jury that its decision on death was not the final decision but was "reviewable." After defense counsel objected to this argument, the trial judge ruled that the prosecutor was correct. The Supreme Court held that because it could not determine that the effort of the State to minimize the jury's sense of responsibility for determining the appropriateness of death "had no effect on the sentencing decision, that decision does not meet the standard of reliability that the Eighth Amendment requires." *Caldwell v. Mississippi,* 472 U.S. at 341. The sentence was reversed, and this case was remanded for further proceedings.

In *Howard v. State,* 348 Ark. 471, 79 S.W.3d 273 (2002), the appellant argued to this court that the circuit judge should have intervened and stopped the prosecutor from arguing that the victim's last sight before death was that of her strangled seven-month-old child dangling from an extension cord. The appellant invoked *Wicks v. State, supra,* in support of its argument. This court considered the question of prejudice to the appellant, even though there had been no objection by defense counsel, and we cited *Wicks.* We held, however, that the prosecutor's argument did not rise to the level of seriousness where an admonition to the jury or mistrial was required. The same holds true in the instant case. In looking at the comments of the State, the comments of the judge, and the comments of the defense, we conclude that the prosecutor's comments were not so flagrant as to require the judge to intervene *sua sponte.* That Mr. Isom sealed his fate by his own actions and that the jury must now do its duty does not appear to this court to be an impermissible shifting of the jury's responsibility for fixing the penalty. Nor does the prosecutor's argument that Mr. Burton had no right to appeal. Accordingly, though we choose to address the *Caldwell* issue even when no objection was made by defense counsel, we conclude that Mr. Isom's Eighth Amendment rights were not violated.

The next argument of the prosecutor contested by Mr. Isom dealt with an escape and murder by a convicted murderer that was unconnected in any way to the instant case. The prosecutor's argument was this: "Heard [defense counsel] say that he'll never be a threat to you, never be a threat to [Mrs.] Lawson. Well, I think you remember a little over a year ago, the family of Cecil Boren wouldn't look at it that way." Cecil Boren had been the murder victim of a prisoner who had been convicted of a previous murder and who had escaped. Defense counsel immediately objected to this argument, and the circuit judge admonished the jury as follows:

> This is argument, ladies and gentlemen. There's been no evidence presented about either the cases Mr. Colvin [defense counsel] mentioned or this one that Mr. Cason [prosecutor] mentioned. So they really don't have anything to do with this case. This case should be decided on its own facts.

The prosecutor's reference to an unrelated case where an escaped convict murdered Cecil Boren was undoubtedly improper, and we do not in any wise condone such arguments. Nevertheless, it is apparent to this court that it was defense counsel who first went outside the record and referred to unrelated cases, including the Charles Manson case, the mother who drowned her two children in a car, and finally the two women who were slain at a Pizza Hut in Arkansas. In all these cases, the killers received a sentence of life without parole. That argument by defense counsel also was improper. However, it is the circuit judge's immediate admonishment to the jury to disregard defense counsel's and the prosecutor's remarks that tempers the prosecutor's reference to the Cecil Boren murder. Moreover, defense counsel made no request for a mistrial. And, finally, the jury had earlier been instructed that arguments of counsel with no basis in the evidence should be discarded. Any taint resulting from these arguments was substantially diminished by the circuit judge's instruction and admonishment. We hold that Mr. Isom was not denied a fair trial because of the Cecil Boren comment.

### V. Lesser-Included Offense of Robbery

Mr. Isom contends that by failing to instruct the jury on the lesser-included offense of robbery and by instructing on theft for purposes of first-degree murder, the jury was limited in its consideration to the offense of capital murder, to the exclusion of

first-degree murder. He contends that this was so because there was insufficient proof of theft to support the first-degree murder instruction, while there was sufficient proof of robbery. Mr. Isom, however, failed to preserve this point for appeal. Specifically, he failed to object to the first-degree murder instruction that included theft as the predicate felony. In short, he never mentioned robbery as a predicate felony for first-degree murder before the circuit judge. Rather, he raises it before this court for the first time on appeal. This he cannot do. *See Willet v. State,* 322 Ark. 613, 911 S.W.2d 937 (1995).

Mr. Isom further contends that the circuit judge erred in not instructing the jury on ordinary robbery as a lesser-included offense of aggravated robbery. Generally, this court will affirm a circuit judge's decision to exclude an instruction on a lesser-included offense only if there is no rational basis for giving the instruction. *See, e.g., McCoy v. State,* 347 Ark. 913, 69 S.W.3d 430 (2002); *Brown v. State,* 347 Ark. 44, 60 S.W.3d 422 (2001).

A person commits § 5-12-103 aggravated robbery if "he commits robbery as defined in § 5-12-102, and he: (1) Is armed with a deadly weapon or represents by word or conduct that he is so armed; or (2) Inflicts or attempts to inflict death or serious physical injury upon another person." Ark. Code Ann. § 5-12-103 (Repl. 1997). Section 5-12-102 of our Criminal Code defines what constitutes robbery and states that a person commits robbery if "with the purpose of committing a felony or misdemeanor theft or resisting apprehension immediately thereafter, he employs or threatens to immediately employ physical force upon another." Ark. Code Ann. § 5-12-102 (Repl. 1997). Thus, ordinary robbery involves the employment of physical force, while aggravated robbery entails being armed with a deadly weapon or the infliction of death or serious physical injury on another.

Ordinary robbery is generally a lesser-included offense of aggravated robbery, and more often than not a robbery instruction is required when the charge is aggravated robbery. *See Brown,* 347 Ark. 44, 60 S.W.3d 422. However, when the evidence is so conclusive as to show that only aggravated robbery was committed, the judge need not instruct the jury on mere robbery. *Id.* In the case at hand, we conclude that there was no rational basis for the circuit judge to instruct the jury on ordinary robbery. Mr. Isom pushed into Mr. Burton's trailer home, demanded money, and pulled out a pair of broken scissors to enforce his demand. He

later murdered Mr. Burton and inflicted serious physical harm on Mrs. Lawson. These facts support the circuit judge's decision. There was no reversible error regarding this issue.

### VI. Aggravator for Avoiding or Preventing an Arrest

Mr. Isom claims that the circuit judge violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights by allowing the submission of the aggravator that the capital felony murder was committed to avoid or prevent an arrest, because it failed to narrow the class of persons subject to the death penalty. According to Mr. Isom, the only way a defendant could rebut this aggravator would be to take the stand, admit to the killing, and say it had nothing to do with a desire to avoid arrest. He also invites this court to revisit its holding in *Coulter v. State*, 304 Ark. 527, 804 S.W.2d 348 (1991), because under that holding, the prosecution could always argue that the murder was committed to limit or eliminate eyewitness testimony.

Our Criminal Code limits the use of aggravating circumstances to ten, including: "The capital murder was committed for the purpose of avoiding or preventing an arrest or effecting an escape from custody." Ark. Code Ann. § 5-4-604(5) (Repl. 1997). This court has held that this subsection is not unconstitutionally vague or overbroad and, further, that it does not fail to narrow and channel the jury's discretion in deciding the propriety of punishment. *See, e.g., Bowen v. State*, 322 Ark. 483, 911 S.W.2d 555 (1995), *cert. denied*, 517 U.S. 1226 (1996); *Coulter v. State, supra*; *Whitmore v. Lockhart*, 834 F. Supp. 1105 (E.D. Ark. 1992), *aff'd*, 8 F.3d 614 (8th Cir. 1993). In *Hill v. State*, 278 Ark. 194, 644 S.W.2d 282 (1983), this court expressly found that the aggravating circumstance in question was properly submitted to the jury and was not vague and overbroad where, under the facts of that case, the jury was justified in finding that the defendant shot the victim to increase his chances of avoiding arrest.

We decline Mr. Isom's invitation to revisit *Coulter v. State, supra*. We have recognized that a consequence of every murder is the elimination of the victim as a potential witness. *See Kemp v. State*, 324 Ark. 178, 919 S.W.2d 943, *cert. denied*, 519 U.S. 982 (1996). However, we have added that avoiding arrest is not necessarily an invariable motive for killing. *Id.* Manifestly, there are multiple motives for murder. The jury in the instant case could readily have found that Mr. Isom sought to kill both Mr. Burton

and Mrs. Lawson to eliminate them as witnesses and, thus, prevent his arrest. Whether the same holds true to other murder cases is irrelevant to this appeal and beyond the scope of our review. In addition, we disagree that this aggravator does not narrow the class of persons subject to the death penalty. The jury concluded that the aggravator applied, and the effect of that finding is to limit the class of people for which the death penalty may be appropriate. We affirm the circuit judge on this point.

## VII. Capital Murder Statute is Unconstitutional

For his last point, Mr. Isom claims that the capital murder statute is unconstitutional on its face and as applied, because there is no guidance provided in Ark. Code Ann. §§ 5-10-101 (capital murder) and -102 (first-degree murder) as to which statute applies in a homicide case. Accordingly, he maintains that the capital murder statute is void for vagueness and overlaps with the first-degree murder statute. Moreover, he argues that the statute wrongly places the decision of which charge to pursue in the hands of the prosecutor, which necessarily leads to inconsistent charges and convictions in different judicial districts based on the same facts. Thus, he maintains disparate treatment of defendants results, all of which is in violation of the Equal Protection Clause of the United States Constitution.

This argument was not made to the circuit judge and as a result does not qualify for this court's review. Nor does it qualify, in our judgment, under the *Wicks* exception as a matter integral to the jury's assessment of the death penalty. Furthermore, this issue has been raised and dismissed by this court numerous times. *See, e.g., Hill v. State*, 344 Ark. 216, 40 S.W.3d 751 (2001); *Echols v. State*, 326 Ark. 917, 936 S.W.2d 509 (1996), *cert. denied*, 520 U.S. 1244 (1997); *Jones v. State*, 328 Ark. 307, 942 S.W.2d 851 (1997).

The record in this case has been reviewed for reversible error as required by Supreme Court Rule 4-3(h), Arkansas Code Annotated § 16-91-113(a) (1987), and Arkansas Rules of Appellate Procedure—Criminal Rule 10, and none has been found.

Affirmed.

CORBIN, J., not participating.

Special Justice KEVIN CRASS joins.